**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | |
| MSP RECOVERY CLAIMS, SERIES, LLC, MAO-MSO RECOVERY II, LLC, SERIES PMPI, and MSPA CLAIMS 1, LLC, | : : : : | |
| | : | |
| | : | Civil Action No. 3:18-cv-2211-BRM-LHG |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | **OPINION** |
| | : | |
| SANOFI AVENTIS U.S. LLC, NOVO NORDISK INC., and ELI LILLY AND COMPANY | : : : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendants Sanofi Aventis U.S. LLC ("Sanofi Aventis"), Novo Nordisk Inc. ("Novo Nordisk"), and Eli Lilly and Company's ("Eli Lilly") (collectively, "Defendants") Motion to Dismiss Plaintiffs MSP Recovery Claims ("MSP Recovery"), Series, LLC ("Series"), MAO-MSO Recovery II, LLC, Series PMPI ("MAO-MSO"), and MSPA Claims 1, LLC's ("MSPA") (collectively, the "Plaintiffs") Amended Complaint for lack of Article III standing and failure to state a claim with respect to each cause of action asserted. (ECF No. 71.) Plaintiffs opposed Defendants' Motion to Dismiss. (ECF No. 75.) Having held oral argument on March 21, 2019 and having reviewed the submissions filed in connection with

the motions, for the reasons set forth below and for good cause shown, Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

I.    PROCEDURAL AND FACTUAL BACKGROUND

**A. Procedural History**

On February 15, 2018, Plaintiffs filed a Complaint before this Court asserting various causes of action against the Defendants. (ECF No. 1.) On July 18, 2018, Plaintiffs filed a First Amended Complaint (the "Amended Complaint"), asserting violations of 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against all Defendants (Count One), conspiracy to violate RICO pursuant to 18 U.S.C. § 1962(d) against all Defendants (Count Two), violations of the Arizona Consumer Fraud Act, Delaware Consumer Fraud Act, Florida Deceptive and Unfair Practice Act, Illinois Consumer Fraud and Deceptive Business Practices Act, Minnesota Prevention of Consumer Fraud Act, Minnesota Uniform Deceptive Trade Practices Act, Missouri Merchandising Practices Act, the New Jersey Consumer Fraud Act, and the New Mexico Unfair Trade Practices Act (Count Three), common law fraud against all Defendants (Count Four), and common law unjust enrichment against all Defendants (Count Five). (ECF No. 70.)

On August 20, 2018, Defendants filed a Motion to Dismiss the Amended Complaint asserting Plaintiffs lacked Article III standing, failed to state a RICO claim, failed to state claims under the various state consumer protection laws, failed to state a claim for common law fraud, and failed to state a claim for common law unjust enrichment. (ECF No. 71-1 at 13-41.) On October 4, 2018, Plaintiffs filed an Opposition to Defendants' Motion to Dismiss. (ECF No. 75.) On November 19, 2018, Defendants filed a Reply Brief to Plaintiffs' Opposition to its Motion to Dismiss. (ECF No. 76.)

### B. Factual Background

#### i.    Parties and Background

For the purpose of this Motion to Dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to the Plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Furthermore, the Court also considers any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

MSP Recovery is a Delaware entity with its principal place of business in Miami, Florida (ECF No. 70 ¶ 36), MSPA is a Florida entity with its principal place of business in Coral Gables, Florida (ECF No. 70 ¶ 37), and MAO-MSO is a Delaware entity with its principal place of business in Cresskill, New Jersey. (ECF No. 70 ¶ 38). Plaintiffs have been assigned recovery rights for multiple Medicare Advantage plans, including various Medicare Advantage organizations ("MAOs"), health maintenance organizations ("HMOs"), and management service organizations ("MSOs") (collectively, "Plaintiffs' Assignors"). (ECF No. 70 ¶ 39.) Plaintiffs' Assignors paid Medicare benefits on behalf of Medicare-eligible beneficiaries enrolled under the Medicare Advantage program. (ECF No. 70 ¶ 40.)

Sanofi Aventis is a Delaware limited liability company headquartered in Bridgewater, New Jersey. (ECF No. 70 ¶ 41.) Sanofi Aventis manufactures Apidra, a rapid-acting insulin, and Lantus, a long-acting insulin. (*Id.*) Novo Nordisk is a Delaware corporation headquartered in Plainsboro, New Jersey. (ECF No. 70 ¶ 42.) Novo Nordisk manufactures NovoLog, a rapid-acting insulin, and Levemir, a long-acting insulin. (*Id.*) Eli Lilly is an Indiana corporation headquartered in Indianapolis, Indiana. (ECF No. 70 ¶ 43.) Eli Lilly produces the rapid-acting

insulin Humalog and "markets, distributes, and sells its products throughout the state of New Jersey," maintaining a registered agent in West Trenton, New Jersey. (*Id.*)

Approximately 30 million people in the United States suffer from diabetes. (ECF No. 70 ¶ 1.) Diabetes is a condition in which the body does not properly process food for use as energy. (ECF No. 70 ¶ 57.) People suffering from diabetes are unable to produce enough insulin, or cannot use insulin as effectively as necessary, and thus have high levels of glucose in their blood stream thereby posing serious or fatal health risks. (ECF No. 70 ¶¶ 59-60.) Plaintiffs' Assignors have paid for over one million prescriptions of insulin in the past ten years. (ECF No. 70 ¶ 63.)

Since 2003, the cost of one vial of insulin or one box of five insulin pens has increased by more than 500%, grossly incommensurate with the rate of medical inflation. (ECF No. 70 ¶ 65.) This has occurred "even in the face of supposed competition between manufacturers with similar drugs." (ECF No. 70 ¶ 66.)

### ii.    Medicare

Plaintiffs are the assignees of Medicare Act Part C and/or Part D prescription drug coverage providers who provide benefits to thousands of beneficiaries. (ECF No. 70 ¶ 71.)[1] The Medicare Act consists of five parts, A through E. 42 U.S.C. § 1395 *et seq.* Medicare Parts A and B create and regulate traditional fee-for-service Medicare. 42 U.S.C. §§ 1395c-1395w. Medicare Part C outlines the Medicare Advantage Program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits to them, 42 U.S.C. §§ 1395w-21-29, whereas Medicare Part D provides for prescription drug coverage to Medicare beneficiaries, 42 U.S.C. §§ 1395x, 1395y.

Medicare Part D coverage is a voluntary prescription drug benefit program established

---

[1] The Medicare Act, 42 U.S.C. § 1395 *et seq.* is a "federally funded health insurance program for the elderly and disabled." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1993).

for Medicare beneficiaries in 2003. (ECF No. 70 ¶ 78.) A Medicare beneficiary may enroll in Part D if he or she lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or is enrolled under Part B. (ECF No. 70 ¶ 79.) Medicare Part D is based on a "private market model," whereby Medicare contracts with private entities, known as sponsors, to administer prescription drug plans. (ECF No. 70 ¶ 80.) The Part D plan sponsor must provide qualified prescription drug coverage and submit a bid to become a benefits contractor. (ECF No. 70 ¶¶ 81-82.) If the Plan D sponsor's bid exceeds the "benchmark" price, the enrolled beneficiary must pay the difference as part of a monthly premium. (ECF No. 70 ¶ 83.)

The Center for Medicare and Medicaid Services ("CMS"), the federal agency within the Department of Health and Human Services that administers the Medicare program, provides each Part D plan sponsor with advance monthly payments equal to the plan sponsor's standardized bid. (ECF No. 70 ¶ 84.) Part D sponsors must meet a $400 deductible and are then "responsible for 75% of all payments in the second phase." (ECF No. 70 ¶ 86.) Medicare Part D beneficiaries must stay in this second phase until they and the plan have spent a total of $3,700 on covered drugs. (ECF No. 70 ¶ 87.) Upon reaching the second coverage breaking point, the beneficiary is then in the Medicare Part D "Donut Hole." (ECF No. 70 ¶ 88.) The "Donut Hole" refers to a "coverage gap phase where the beneficiary must pay for branded drugs at 40% of the list price, the manufacturer discounts braded drugs by 50%, and the plan pays the remaining 10%." (*Id.*) A beneficiary leaves the coverage gap and is covered again after spending a total of $4,950 out-of-pocket. (ECF No. 70 ¶ 91.) This occurs when total drug costs covered by the beneficiary, the plan, and discounts reach $7,425. (*Id.*)

### iii.   The Insulin Pricing Scheme

Plaintiffs contend the prices that Plaintiffs' Assignors paid and continue to pay for

Defendants' analog insulin are inflated because of Defendants' "insulin pricing scheme." (ECF No. 70 ¶ 92.) The insulin pricing scheme alleged "requires payers to pay for both the drug and the undisclosed kickback to the PBMs[2]." (*Id.*) Defendants have not disclosed the details of the insulin pricing scheme to Plaintiffs' Assignors, nor have the "unnamed co-conspirator" PBMs disclosed the nature of the kickbacks they are allegedly paid. (ECF No. 70 ¶¶ 93-94.)

The pharmaceutical supply chain in the United States consists of four major actors: drug manufacturers, wholesale distributors, pharmacies, and PBMs. (ECF No. 70 ¶ 95.) Pharmaceuticals generally originate in manufacturing sites and are then transferred to wholesale distributors before being transferred to retail or mail-order pharmacies, where they are subject to price negotiations and processed through management screens by PBMs. (ECF No. 70 ¶ 96.) Thereafter, the pharmaceuticals are dispensed by pharmacies where they are purchased by the beneficiaries. (*Id.*) PBMs are "paid to administer a third-party payer's drug program," which includes developing the drug formulary. (ECF No. 70 ¶ 97.) Third-party payers provide copies of their PBMs' formularies to providers, pharmacists, and patients in their network to aid prescribers' adherence to the formularies. (ECF No. 70 ¶ 98.)

Formulary inclusion is critical to Defendants' business, as it allows them to increase the sales of their drugs. (ECF No. 70 ¶ 100.) Being included in a formulary and obtaining a "favorable placement" within a formulary ("Tier-1 placement") drives demand for that drug within the network of physicians, pharmacists, and participating plans. (ECF No. 70 ¶ 99.) PBMs have contractual relationships with pharmaceutical manufacturers, retail pharmacies, and wholesalers whereby they negotiate rebates and other fees and concessions. (ECF No. 70 ¶ 102.) These relationships "allow PBMs to exert tremendous influence and control over what drugs are

---

[2] Pharmacy Benefit Managers.

made available to health plans and ultimately the public." (ECF No. 70 ¶ 103.)

PBMs generate revenue in three ways: fees from third-party payers for processing prescriptions and operating mail-order pharmacies, transaction fees from third-party payers on different operations required to manage cash flow between insurers and manufacturers, and through rebates from pharmaceutical manufacturers, such as Defendants. (ECF No. 70 ¶ 105.) Therefore, PBMs have the greatest leverage to negotiate lower prices when two or more manufacturers make interchangeable prices. (ECF No. 70 ¶ 106.) The rebate agreement would create an incentive for PBMs to negotiate lower net prices "if operated ethically and honestly." (ECF No. 70 ¶ 108.) Instead, "Defendants and PBMs have realized that they both benefit if . . . Defendants raise their publicly reported list price, but largely maintain net prices between Defendants and PBMs." (ECF No. 70 ¶ 110.) This scheme allows PBMs to leverage formulary control for kickbacks while also allowing Defendants to maintain or increase their profit margins while maintaining preferred, Tier-1 formulary positions. (ECF No. 70 ¶ 111.)

Although Defendants have sold similar, interchangeable drugs for decades, the list prices have continued to rise in tandem with each competing drug. (ECF No. 70 ¶ 114.) This occurs because Defendants are not competing on price, but rather on higher rebates and fees paid to PBMs. (ECF No. 70 ¶ 115.) This has caused the list price of insulin to rise while the net realized prices for Defendants has remained "relatively constant." (ECF No. 70 ¶¶ 116-24.)

Plaintiffs contend the rising prices are attributable in part to the conflict of interest created when PBMs began acquiring pharmacies, which began in the "early and late 2000s." (ECF No. 70 ¶¶ 125-26.) When a PBM combines with a pharmacy, they lose the incentive to police against pharmaceutical company schemes to steer patients to more expensive analog drugs. (ECF No. 70 ¶ 127.) Due to the size of the PBMs and the volume of beneficiaries they

represent[3], PBMs can steer business between manufacturers based on which will pay the largest kickbacks. (ECF No. 70 ¶ 129.) The size of the rebates and other fees PBMs attract from drug companies is a "carefully guarded secret." (ECF No. 70 ¶ 130.) PBMs "depend on the lack of transparency to conduct their business" and resist "any requirement that they disclose the details of their agreements with drug manufacturers." (ECF No. 70 ¶ 131.)

On November 30, 2016, Novo Nordisk issued a press release explaining the rising price of insulin prices and their continually rising revenue, stating:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make . . . News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "list price" increases we've made over the last decade. In other words, a list price increase by XX percent leads to an automatic XX percent profit for the drug maker. We believe that is misleading and here's why: As the manufacturer, we do set the "list price" and have full accountability for those increases. However, after we set the list price, we negotiate with the companies that actually pay for the medicines, which we call payers. This is necessary in order for our medicines to stay on their preferred drug list or formulary. The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price." The net price more closely reflects our actual profits.

(ECF No. 70 ¶ 139.)

Additionally, in its 2016 annual report, Novo Nordisk admitted to the practice of exchanging rebates for preferential formulary placement, stating:

> Increasingly, PBMs and health plans play a key role in negotiating price concessions with drug manufacturers on behalf of private payers for both the commercial and government channels, and determining the list of drugs covered in the health plan's formulary. Specifically, . . . Payer pressure to reduce the overall drug costs has resulted in greater focus on negotiating higher rebates from drug manufacturers. Private payers are increasingly

---

[3] PBMs manage pharmacy benefits for over 266 million people nationwide. (ECF No. 70 ¶ 132.)

>     keen to adopt narrow formularies that exclude certain drugs, while
>     securing increased rebates from the preferred brand.

(ECF No. 70 ¶ 140.)

Consequently, Novo Nordisk's 2016 report announced contract negotiations for 2017 with "higher than anticipated" rebates purportedly necessary to obtain broader coverage for its products. (ECF No. 70 ¶ 141.)

Similarly, Eli Lilly and Sanofi Aventis also admitted they raise their list prices on a *quid pro quo* basis in exchange for including their products on preferred drug formularies. (ECF No. 70 ¶¶ 142-44.) Eli Lilly's CEO explicitly conceded "higher rebates can be an incentive for a payer to stick with . . . essentially a higher-priced product." (ECF No. 70 ¶ 143.) Meanwhile, Sanofi Aventis made a similar admission, with its CEO noting "increased rebates in the U.S. to secure favorable formula repositions for Lantus with key payers have kicked in since January 1, 2015." (ECF No. 70 ¶ 144.) As such, Plaintiffs assert the insulin pricing scheme benefits Defendants and PBMs at the expense of the public, including third-party payers, MAOs, and the Medicare Trust Fund. (ECF No. 70 ¶ 150.)  Defendants' scheme results in third-party payers, including Plaintiffs' Assignors, being saddled with increasing costs based on inflated prices with MA Plans being powerless in maximizing benefits for their beneficiaries prior to the donut hole. (ECF No. 70 ¶ 152.)

Plaintiffs assert Defendants "compete" with each other not on price, but by offering rebates for insulin to PBMs who profit from every list price increase through the kickbacks they receive. (ECF No. 70 ¶ 167.) Defendants "deliberately and intentionally" published benchmark prices for the analog insulins that did not reflect the actual market prices of the drugs. (ECF No. 70 ¶ 168.) Instead, the listed benchmark prices "were fabricated overstatements to create net-to-benchmark price spread[s] that Defendants could market to PBMs in exchange for formulary

status." (*Id.*) Without the fraudulent spread scheme, Defendants would have to compete for PBM market share by lowering prices. (*Id.*) Rather, Defendants "closely guarded their pricing structures and sales figures for their analog insulins" such that they "kept the net prices [they] offered to the three largest PBMs a secret." (ECF No. 70 ¶ 169.) As a result of Defendants' insulin pricing scheme, Plaintiffs' Assignors have overpaid for analog insulin for their beneficiaries, thereby depleting finite resources available to provide MA Plan benefits. (ECF No. 70 ¶ 170.)

## II.    LEGAL STANDARDS

### A.  Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).   However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "'document *integral to or explicitly relied upon* in the complaint.'" *Burlington Coat Factory*, 114 F.3d at

1426 (quoting *Shaw*, 82 F.3d at 1220).

## B.  Rule 9(b)

Pursuant to Federal Rule of Civil Procedure 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake, although intent, knowledge, and other conditions of a person's mind may be alleged generally." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (citations omitted); *see also U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (holding that a "plaintiff alleging fraud must . . . support its allegations with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue") (citations omitted). Accordingly, "a party must plead [its] claim with enough particularity to place defendants on notice of the 'precise misconduct with which they are charged.'" *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

## III.  DECISION

### A.  Article III Standing

Defendants assert the Amended Complaint must be dismissed in its entirety because Plaintiffs lack Article III standing to maintain the suit. (ECF No. 71-1 at 13-22.) Specifically, Defendants contend the assignments by Plaintiffs' Assignors are invalid, as they do not encompass the claims asserted in the Amended Complaint and are void under various state laws, and that Plaintiffs have failed to allege an injury in fact. (*Id.*) Plaintiffs counter that the assignments are valid as the claims asserted were explicitly assigned to Plaintiffs, the common

law doctrine of champerty does not apply, and they have incurred an injury in fact. (ECF No. 75 at 2-16).

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The standing inquiry focuses on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014) (citing *Davis v. FEC*, 554 U.S. 724, 734 (2008)). Specifically, Article III standing "consists of three elements." *Spokeo*, 136 S. Ct. at 1547. To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendants, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)).

### 1. Assignments

Defendants contend Plaintiffs fail to allege valid assignments because Plaintiffs' assignments do not encompass the claims asserted in the Amended Complaint and such assignments are invalid under the state laws applicable to those assignments. (ECF No. 71-1 at 14-18.) Plaintiffs assert that the assignments were express, are not void under state law, and the applicable state laws do not require dismissal under these circumstances. (ECF No. 75 at 2-14.) The Third Circuit has held that the assignment of any claims – including RICO claims – must be "express" in order to be deemed valid. *Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112 (3d Cir. 1993). An "express" assignment must make reference to "legal causes of action or claims" in a

manner that is "unambiguous and all-inclusive." *Id.*[4]*; see also Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 438 (3d Cir. 1993). On the contrary, "general assignment[s]" of "rights, title and interest" are not sufficiently express to adequately assign legal claims. *Lerman*, 10 F.3d at 112; *see also Gulfstream*, 925 F.2d at 440 (holding "general assignments, without specific reference to . . . claims, cannot validly transfer the right to pursue those claims").

Plaintiffs' claims of assignments are sufficiently pled so as to withstand Defendants' Motion to Dismiss. Plaintiffs pled they have been assigned recovery rights for multiple Medicare Advantage plans, including MAOs, HMOs, and MSOs. (ECF No. 70 ¶ 39.) Here, Plaintiffs' Assignors include Preferred Medical Plan, SummaCare, and Interamerican Medical Center ("IMC"). Although Plaintiffs do not provide these assignments in the Amended Complaint or in their opposition to Defendants' Motion to Dismiss, Defendants provide the assignment agreements between Plaintiffs and assignors IMC (ECF No. 71-3, Ex. A) and SummaCare (ECF No. 71-4, Ex. B). Both the IMC and SummaCare assignments expressly set forth the respective assignors' intention that Plaintiffs be assigned any and all rights of recovery stemming from the allegedly fraudulent insulin pricing scheme.

The IMC assignment contract, which took effect on February 20, 2015, irrevocably assigns certain rights under state and federal law to MSP Recovery, stating in pertinent part:

> By way of this Agreement, [IMC] appoints, directs, and, otherwise, irrevocably assigns all of [IMC]'s rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly

---

[4] The *Lerman* court determined a RICO claim was validly assigned where the assignor assigned "without limitation, any and all of the following: . . . causes of action, judgments, claims and demands [pursuant to RICO] of whatsoever nature." *Lerman*, 10 F.3d at 113. The Third Circuit held "that language unambiguously extinguished [the assignor]'s right to assert any legal claims or causes of action against third parties based on [the facts provided]. Accordingly, the assignment was not partial." *Id.*

and/or indirectly for any of its members and/or plan participants, and/or its rights pursuant to any agreement with the understanding that the irrevocable assignment requires that MSP Recovery compensate [IMC] as per the terms of this Agreement even if [IMC] cancels the Agreement pursuant to the terms therein.

. . .

Although the main claim(s) covered by this agreement are those that fall within the purview of the Medicare Secondary Payer Act, this Agreement shall not limit MSP Recovery as it pertains to any other equitable and/or legal rights that may exist wherein [IMC] has the right(s) to pursue all of its fee for service claim(s) or is, otherwise, entitled to recover under any theory of recovery that now exists or may exist in the future.

(ECF No. 71-3, Ex. A at 10-13.)

Similarly, the SummaCare assignment contract, which took effect on May 12, 2017, also assigns broad legal rights to the Plaintiffs as assignees, stating in pertinent part:

[SummaCare] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [SummaCare]'s right, title, ownership and interest in and to all Claims existing on the date hereof, whether based on contract, tort, statutory right, and any and all rights . . . to pursue and/or recover monies for [SummaCare] that [SummaCare] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [SummaCare] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitution the "Assigned Claims[.]" . . . The transfer [of rights] . . . shall remain the confidential and exclusive property of MSP Recovery or its assigns. This assignment is irrevocable and absolute.

(ECF No. 71-4, Ex. B at 5.)

The agreements between Plaintiffs and IMC and SummaCare are sufficiently express and, when reading the contract "as a whole, and with common sense" it is clear that the Plaintiffs' Assignors intended that Plaintiffs bring any and all viable claims, and not merely

those under the Medicare Secondary Payer Act, as Defendants contend. *A.D.L. v. Cinnaminson Twp. Bd. of Educ.*, 975 F. Supp. 2d 459, 466 (D.N.J. 2013). Indeed, both agreements with which this Court has been provided explicitly note that Plaintiffs' rights to recover thereunder are not limited to any particular statute but are all-encompassing with respect to payments made by the assignors. (ECF No. 71-3, Ex. A at 10-13; ECF No. 71-4, Ex. B at 5.) Accordingly, Plaintiffs' assignments encompass the claims asserted in the Amended Complaint.[5]

Next, Defendants assert Plaintiffs' assignments are void under various state laws. (ECF No. 71-1 at 17-18.) Specifically, Defendants contend Plaintiffs' assignments violate the prohibition against "champertous" assignments under the four state laws applicable to the assignment and re-assignment contracts: New York, Delaware, Florida, and Ohio. (*Id.*)[6] Plaintiffs counter that the question of champertous intent is a fact-intensive inquiry that may not be disposed of at the motion to dismiss stage, but that nevertheless, they have sufficient interest in the litigation such that the assignments do not run afoul of the doctrine of champerty and are thus valid under the applicable state laws. (ECF No. 75 at 6-13.)

Under New York law, the "question of champertous intent is a fact-intensive inquiry" in which the defendant must demonstrate that the plaintiff acquired the claim for the "sole or primary purpose of bringing suit." *Elliot Assocs., L.P. v. Republic of Peru*, 948 F. Supp. 1203, 1208 (S.D.N.Y. 1996) (citing *CIBC Bank & Trust Co. (Cayman) Ltd. v. Banco Cent. Do Brasil*,

---

[5] To the extent this Court was not provided with additional assignments, this Court notes the intent of the scope of rights underlying such assignments is an issue of fact and therefore not appropriately disposed of at the Motion to Dismiss stage.

[6] The doctrines of champerty and maintenance "refer to arrangements where a party acquires an interest in something merely by participating in a lawsuit in which the party otherwise has no independent status to join." 14 Am. Jur. 2d Champerty, Maintenance, Etc. § 1 (2019). "Champerty is a type of maintenance in which the intermeddler makes a bargain with one of the parties to the action to be compensated out of the proceeds of the action." (*Id.*)

886 F. Supp. 1105, 1110 (S.D.N.Y. 1995)). Accordingly, the issue of champertous intent may not be adjudicated at the motion to dismiss stage. *Id.*

Furthermore, pursuant to the laws of Ohio, Delaware, and Florida – under which champertous intent is a valid ground on which to seek a dismissal at the motion to dismiss stage – this Court is persuaded that Plaintiffs' claims should not be dismissed at this stage of the litigation.

Ohio law defines champerty as a "form of maintenance in which a nonparty undertakes to further another's interest in a suit in exchange for a part of the litigated matter *if a favorable result ensures.*" *Hiles v. NovaStar Mortg., Inc.*, 2012 WL 4813775, at *4 (S.D. Ohio 2012) (emphasis added) (quoting *Rancman v. Interim Settlement Funding Corp.*, 789 N.E.2d 217, 219 (Ohio 2003)).[7] Importantly, to bar a suit on the grounds of champerty under Ohio law, a court must be persuaded that the assignee either has "no bona fide interest in the case" or would "receive a stake" in the assignors' claims. *Hiles*, 2012 WL 4813775, at *4 (quoting *Rancman*, 789 N.E.2d at 222). Here, there is no allegation that Plaintiffs would "receive a stake" in the Plaintiffs' Assignors' claims. Additionally, Plaintiffs have alleged a bona fide interest in the case. Plaintiffs' claims do not fail merely because they contracted to disperse the proceeds to their assignors, *see Sprint Comms. Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (holding an "assignee of a legal claim for money owed has standing to pursue that claim in federal court, even when the assignee has promised to remit the proceeds of the litigation to the assignor), and Plaintiffs noted they were assigned the claims due in part to the assignors' difficulty in identifying potential causes of action. (ECF No. 75 at 8.)

---

[7] The *Rancman* court further noted the "doctrines of champerty and maintenance were developed at common law to prevent officious intermeddlers from stirring up strife and contention by vexatious and speculative litigation which would disturb the peace of society." *Rancman*, 789 N.E.2d at 219-20.

For the same reasons Defendants' arguments fail pursuant to Ohio law, they also fail pursuant to the laws of the states of Delaware and Florida. *See Hall v. State*, 655 A.2d 827, 829-30 (Del. Super. Ct. 1994) (holding "[t]he doctrines of champerty and maintenance apply only to volunteers or strangers – those who have no legal interest in the subject matter of the dispute; those who have no relation to either of the parties; and those who are not acting in the lawful exercise of their profession as counsel to one of the parties" and "[i]n a champertous assignment, an assignee of a cause of action initiates litigation at his or her own risk and expense in consideration of receiving a portion of the proceeds if successful"); *see also Kraft v. Mason*, 668 So.2d 679, 682 (Fla. Ct. App. 1996) (holding "[c]hamperty is a form of [officious intermeddling in a suit which in no way belongs to the intermeddler] wherein one will carry on a suit in which he has no subject matter interest at his own expense or will aid in doing so in consideration of receiving, if successful, some part of the benefits recovered"). Accordingly, Defendants have not demonstrated the assignments were champertous, and in any event, a denial of Plaintiffs' claims pursuant to the doctrine of champerty at this point in the litigation would be premature.

## 2.  Injury in Fact

Defendants contend Plaintiffs lack Article III standing because they have not plausibly alleged an injury in fact for which they can recover. (ECF No. 71-1 at 18-22.) Specifically, Defendants make three assertions: IMC is not an entity that provides Medicare drug coverage and therefore has no damages; Plaintiffs failed to plead the assignors suffered any injury from inflated analog insulin prices; and the exhibits attached to the Amended Complaint do not demonstrate the assignors overpaid for insulin. (*Id.*) Plaintiffs counter that Defendants' arguments are erroneous as IMC pays directly for pharmaceuticals, Plaintiffs allege their

assignors suffered harm by virtue of their payment based on inflated list prices, and Exhibit A provides voluminous proofs of inflated payments for analog insulin. (ECF No. 75 at 13-16.) "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (citations omitted). A "concrete" injury must be "*de facto*;" that is, it must actually exist. *Id.*

First, Defendants contend IMC is merely a "medical services provider and health care clinic" and Plaintiffs "cannot explain how an entity that does not provide Medicare Part D coverage could have suffered an injury from allegedly inflated prices of drugs covered under Medicare Part D." (ECF No. 71-1 at 19.) However, Plaintiffs have alleged that Plaintiffs' Assignors, including IMC, which is a MAO, provide Medicare benefits pursuant to specific contractual agreements with particular networks. (ECF No. 70 ¶¶ 2, 215.) Whether IMC actually provides such benefits, and to what extent, is a question of fact that this Court cannot adjudicate at the motion to dismiss stage.

Second, Defendants assert Plaintiffs "fail to plead that the assignors suffered any injury from analog insulin prices." (ECF No. 71-1 at 19.) Defendants maintain the Amended Complaint "does not identify a *single* payment for analog insulin by an assignor based on the supposedly inflated list prices." (ECF No. 71-1 at 19-20.) Defendants' contention is erroneous. The Amended Complaint pleads the existence of a scheme between PBMs to widen the spread between the "list price" and the "net price" of insulin, which results in a profit to Defendants and the expense of Plaintiffs' Assignors. (ECF No. 70 ¶¶ 4, 139-44.) Coupled with the allegations of

purchases made by Plaintiffs' Assignors, Plaintiffs certainly allege a concrete and particularized injury sufficient to constitute an adequately pled injury in fact.

Finally, Defendants contend Exhibit A, which is attached to the Amended Complaint, does not establish an injury in fact as Plaintiffs do not allege any of the listed transactions constitute an overpayment and "nothing on the face of the documents suggest that they do." (ECF No. 71-1 at 21.) Exhibit A merely provides consumer data for each purchase of analog insulin: the unique internal patient code; the source NDC codes which are unique codes for pharmaceuticals delineating the labeler, the drug, and the dosage; the product name; the date of service; and how much the Plaintiffs' Assignors paid for the pharmaceuticals. (ECF No. 70 ¶ 47 n.1.) Without cross-referencing such payments against the net prices, there would be no way of deducing from the information provided whether such payments were in fact overpayments. Defendants' argument that Exhibit A – which is thousands of pages in length – does not suggest overpayment, is unpersuasive. Furthermore, Defendants' reliance on *Binsack v. Lackawanna Cty. Prison*, 438 F. App'x 158, 160 (3d Cir. 2011) is erroneous. *Binsack* concerned a complaint that was unintelligible on its face and failed to make out cognizable causes of action. *Id.* This is not the case here.

Plaintiffs have pled a valid assignment under the applicable state laws and have alleged an injury in fact, therefore, they possess Article III standing to proceed with this lawsuit. Accordingly, Defendants' Motion to Dismiss for lack of Article III standing is **DENIED**.

### B. RICO Violation Claims

Defendants contend Plaintiffs have failed to plead a RICO claim as Plaintiffs do not allege Defendants committed RICO predicate acts, failed to allege the existence of a RICO enterprise, lack standing pursuant to the indirect purchaser rule, and fail to allege a RICO

conspiracy. (ECF No. 71-1 at 22-33.) Plaintiffs dispute this argument claiming they have sufficiently alleged RICO predicate acts and a RICO enterprise and that they do not constitute indirect purchasers "to the extent that concept is applicable to RICO actions." (ECF No. 75 at 16-31.)

To demonstrate a violation of 18 U.S.C. § 1962(c), a plaintiff must prove: "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated . . . , either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity." *United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011) (quoting *United States v. Irizarry*, 341 F.3d 273, 285 (3d Cir. 2003)). Proving a violation of 18 U.S.C. § 1962(c) "requires no more than this." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

### 1. RICO Predicate Acts

Defendants contend the Amended Complaint should be dismissed because Plaintiffs have failed to "adequately allege that defendants committed two or more predicate acts of racketeering." (ECF No. 71-1 at 23.) Plaintiffs argue they have "more than adequately alleged mail and wire fraud" by virtue of Defendants' repeated misrepresentations every time they published false or artificially inflated benchmark prices. (ECF No. 75 at 24-26.) Illicit racketeering activity includes "a host of so-called predicate acts, including 'any act which is indictable under . . . Section 1341 [mail fraud].'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting 18 U.S.C. § 1961(1)(B)). The Third Circuit has traditionally interpreted mail fraud statutes broadly. *See United States v. Martinez*, 905 F.2d 709, 715 (3d Cir.), *cert. denied*, 498 U.S. 1017 (1990). Fraud is "measured in a particular case by determining

21

whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." *United States v. Riley*, 621 F.3d 312, 327 n.19 (3d Cir. 2010) (citation omitted). However, without "a specific fraudulent statement" identifying "the time, place, speaker, and content" of the alleged misrepresentation, a civil RICO claim asserting fraud should be dismissed. *Jaye v. Oak Knoll Vill. Condo. Owners Ass'n, Inc.*, 2016 WL 7013468, at *15 (D.N.J. Nov. 30, 2016).

Plaintiffs have adequately pled mail and wire fraud. Plaintiffs allege Defendants committed mail and wire fraud by publishing artificially inflated benchmark prices via mail and interstate wire facilities. (ECF No. 70 ¶¶ 202-06.)[8] Plaintiffs further alleged that Defendants

---

[8] Specifically, Plaintiffs allege

> [t]he Defendant[s'] . . . use of U.S. mails and interstate wire facilities to perpetrate the spread scheme involved thousands of communications throughout the class period, inter alia: a. Marketing materials about the benchmark prices for the analog insulins and the available spreads, which [Defendants] sent to PBMs located across the country; b. Written and oral representations of the analog insulin benchmark prices that the [Defendants] made at least annually and, in many cases, several times during a single year; c. Thousands of written and oral communications discussing, negotiating, and confirming the placement of [Defendants'] analog insulin . . . on a particular PBM's formulary; d. Written and oral representations regarding information or incentives designed to lessen the prices that each of the PBMs paid for the analog insulins, and/or to conceal those prices or the spread scheme; e. Written communications, including checks, relating to rebates, kickbacks, or other financial inducements paid to each of the PBMs to persuade them to advocate for one Defendant Drug Manufacturers' analog insulin over a competitor's product; f. Written and oral communications with U.S. government agencies and private insurers that fraudulently misrepresented what the benchmark prices were, or that were intended to deter investigations into the true nature of the benchmark prices . . .; g. Written and oral communications with health insurers and patients; h. Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire

knew the prices consumers ultimately paid for the analog insulin was based on the fraudulent benchmark prices Defendants published. (ECF No. 70 ¶¶ 4, 28, 168.) Federal courts have held that excessive inflation of prices on a published index may constitute mail and wire fraud. *See In re Lupron® Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 165-68 (D. Mass. 2003); *see also Schmuck v. United States,* 489 U.S. 705, 710-11 (1989). As such, Plaintiffs have adequately pled the requisite predicate acts underlying its RICO claim.

Defendants' reliance on *Republic of Iraq v. ABB AG*, 768 F.3d 145 (2d Cir. 2014) is misplaced. Defendants cite *ABB* for the proposition that the dismissal of a RICO claim is appropriate where "the plaintiff bears 'at least substantially equal responsibility' for the RICO violations of which it complains.'" *ABB*, 768 F.3d at 167-68 (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985)).[9] Although each of Plaintiffs' Assignors purchased Defendants' analog insulin through a designated PBM, that act cannot be said to impute to Plaintiffs "at least substantially equal responsibility" as Defendants, who allegedly perpetrated the insulin pricing scheme with the PBMs. *Id.* Accordingly, Plaintiffs have adequately pled RICO predicate acts so as to withstand Defendants' Motion to Dismiss.

---

> facilities – the wrongful proceeds of the [Defendants'] spread scheme; and i. In addition to the above-referenced RICO predicate acts, Defendants' corporate headquarters have communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the spread scheme.

(ECF No. 70 ¶ 206.)

[9] *ABB* dealt with a RICO claim brought by the Republic of Iraq against numerous defendants who were alleged to have conspired with then-President Saddam Hussein and Iraq's state-owned enterprises to plunder a humanitarian program established by the United Nations. *ABB*, 768 F.3d at 151. The court dismissed the RICO claims holding, *inter alia*, that it was an "inescapable conclusion that the Hussein Regime bears at least substantially equal responsibility for the Programme's corruption." *Id.* at 163.

### 2. RICO Enterprise

Next, Defendants contend Plaintiffs have not adequately pled the existence of a RICO enterprise, as Plaintiffs do not allege a common purpose between the Defendants and the PBMs and fail to allege Defendants "directed the affairs" of the RICO enterprise. (ECF No. 71-1 at 27-29.) Plaintiffs state Defendants' argument fails as it is merely an "insipid repackaging" of its previous assertion that "the PBMs are but a proxy for Plaintiffs and that Defendants and PBMs are not colluding but are playing the adversarial roles" as intended. (ECF No. 75 at 27.) An essential feature of an association-in-fact enterprise is the sharing of a "common purpose" between the members. *United States v. Boyle*, 556 U.S. 938, 948 (2009). "From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the enterprise's purpose." *Id.* at 946.[10] The Third Circuit has held that *Boyle*'s construction of the term "association-in-fact enterprise" is "capacious," "expansive," and "obviously broad." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 366 (3d Cir. 2010). Additionally, a valid RICO enterprise requires "defendants [to] conduct[] or participat[e] in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quoting 18 U.S.C. § 1962(c)).

Plaintiffs have adequately pled a valid RICO enterprise. The Amended Complaint alleged a common fraudulent purpose between the Defendants, provided a motive for such purpose, and detailed the alleged relationships between the Defendants. (ECF No. 70 ¶¶ 10-17; 41-44; 93-104.) Additionally, the Amended Complaint also satisfies the "participation" prong of the RICO

---

[10] The Supreme Court has also defined an association-in-enterprise, for RICO purposes, as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

enterprise inquiry, as it details how Defendants colluded to achieve some benefit that would be unlikely absent collusion: preferred formulary status by virtue of a kickback *quid pro quo* to the PBMs. (ECF No. 70 ¶¶ 18-22.) Thus, when considering the Amended Complaint with a "capacious" and "expansive" view of a RICO enterprise, it is clear that Plaintiffs adequately pled such enterprise. *Brokerage Antitrust Litig.*, 618 F.3d at 366.

Defendants' contentions that Plaintiffs have failed to adequately plead a valid RICO enterprise are without merit. First, Defendants contend Plaintiffs "cannot claim that defendants and the PBMs united together for the common purpose of defrauding plaintiffs' assignors" as Plaintiffs' Assignors hire the PBMs to negotiate rebates and discounts on their behalf. (ECF No. 71-1 at 27-28.) However, merely because Plaintiffs' Assignors may have had some role in the hiring of PBMs with respect to negotiations with Defendants is not necessarily to say that such PBMs could not then collude with Defendants to violate a RICO. In support of its contention, Defendants cite *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015). Specifically, Defendants note *Bible*'s holding that a "run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest" cannot form the basis of a RICO enterprise. *Id.* at 655-56 (citing *United Food & Commercial Workers Unions v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013)). However, Plaintiffs have alleged more than a mere "run-of-the-mill commercial relationship." Indeed, the Amended Complaint asserts that Defendants, in coordination with the PBMs, artificially set benchmark prices, in violation of federal law, to enhance its own profits at the consumers' expense. Therefore, this Court finds Plaintiffs have adequately pled a RICO enterprise.

### 3. The Indirect Purchaser Rule

Defendants argue Plaintiffs lack standing pursuant to the indirect purchaser rule. (ECF

No. 71-1 at 30-32.) Specifically, Defendants contend Plaintiffs' claims must fail as a matter of law because they do not allege that they purchase the analog insulin directly from the manufacturer, but rather, are downstream purchasers. (ECF No. 71-1 at 30-31.) Plaintiffs contend Defendants have mischaracterized the indirect purchaser rule in the RICO context and that they have adequately pled direct injury so as to withstand Defendants' Motion to Dismiss. (ECF No. 75 at 27-31.)[11]

The Supreme Court developed the indirect purchaser rule in the antitrust context, when it held that Clayton Act plaintiffs may not demonstrate injury by providing evidence only of indirect purchases. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 737 (1977). The Court warned that allowing indirect purchasers to recover under such a theory would "transform treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Id.* at 739. Moreover, the indirect purchaser rule was also intended to prevent defendants from being exposed to "multiple liability" should both indirect and direct purchasers in a distribution chain be permitted to assert claims arising out of a single overcharge. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 851 (3d Cir. 1996). As 18 U.S.C. § 1964(c), RICO's private cause of action, was modeled on the Clayton Act, "antitrust standing principles apply equally to allegations of RICO violations." *McCarthy*,

---

[11] Recently, when faced with a highly analogous fact pattern with the same defendants, this Court determined that the indirect purchaser rule precluded a RICO action, stating:

> Although Plaintiffs have adequately pled the various elements of a RICO claim, they failed to allege that they directly purchased the analog insulin from Defendants. Rather, Plaintiffs claim injury by virtue of inflated prices of their downstream purchase. Therefore, Plaintiffs' claims are barred by the indirect purchaser rule, and as such, Plaintiffs lack standing to maintain this action pursuant to RICO.

*In re Insulin Pricing*, No. 17-699, 2019 WL 643709, at *13 (D.N.J. Feb. 15, 2019).

80 F.3d at 855; *see also Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 270-74 (1992).

Defendants highlight that Plaintiffs do not allege that they purchase analog insulin directly from Defendants. Rather, Plaintiffs allege that the insulin is sold to wholesalers at prices based on the list price, who then sell the insulin to pharmacies before the ultimate sale to the MAOs, HMOs, and consumers. (ECF No. 71-1 at 30.) Indeed, the Amended Complaint alleges such a chain of distribution, stating:

> 96. Pharmaceutical products generally originate in manufacturing sites and then are transferred to wholesale distributors, transferred and stocked at retail, mail-order, and other types of pharmacies, then are subject to price negotiations and processed through quality and utilization management screens by PBMs, and are dispensed by pharmacies, and, ultimately, are delivered to and taken to beneficiaries.
>
> . . .
>
> 101. . . . PBMs contract with a network of retail and community pharmacies.
>
> 102. In addition, and of significance here, PBMs have contractual relationships with pharmaceutical manufacturers, retail pharmacies, and pharmaceutical wholesalers, negotiating rebates, fees and other concessions.

(ECF No. 70 ¶¶ 96-102.)

Moreover, the Amended Complaint also features a chart explaining the distribution chain, demonstrating that the insulin is sold from the manufacturer to the wholesaler at a small discount to list price, who then negotiate a price to sell the insulin to a pharmacy, who then dispense to consumers and collect a copay. (ECF No. 70 ¶ 104.) The chart also highlights the role of the PBMs: accepting payment from insurers or employers to manage drug cost, negotiating with manufacturers to receive rebates, and negotiating with pharmacies over reimbursements and other fees. (*Id.*)

Plaintiffs' core allegation is that Defendants engaged in a scheme to "artificially inflate[] each analog insulin's benchmark price" in order to increase their own profits, along with those of the PBMs, at the expense of consumers. (ECF No. 70 ¶¶ 3, 222.) However, Plaintiffs concede that their assignors are not the first party to pay for the analog insulin at a purportedly inflated price. (ECF No. 70 ¶¶ 96-104.) Rather, Plaintiffs outline a scheme whereby the analog insulins are sold to wholesalers at prices based on the benchmark prices that are set by the manufacturers and are then subsequently sold to pharmacies and clinics at prices that approximate the benchmark prices. (*Id.*) As such, Plaintiffs are multiple purchasers down the distribution chain from Defendants and are quintessential indirect purchasers for the purposes of the indirect purchaser rule. *See McCarthy*, 80 F.3d at 848 (holding that "only the purchaser immediately downstream from the alleged [RICO violator]" possesses standing to pursue an action).

Plaintiffs attempt to refute Defendants' arguments by contending that the indirect purchaser rule does not vitiate their RICO standing as the rule does not apply in the same fashion to RICO claims as it does in the antitrust context. (ECF No. 75 at 28-29.) This Court is not persuaded by Plaintiffs' arguments. In *McCarthy*, the Third Circuit unequivocally held that the indirect purchaser rule applies to RICO claims, stating that "the central and dispositive issue [in a RICO action] is whether plaintiffs are 'direct purchasers.' If so, they are entitled to pursue . . . their . . . RICO claims." *McCarthy*, 80 F.3d at 855.

Additionally, Plaintiffs' assertion that the Supreme Court's ruling in *Holmes* exempts RICO claims from standing challenges pursuant to the indirect purchaser rule is erroneous. *Holmes* explicitly held that federal jurisprudence interpreting antitrust principles govern RICO claims because Congress modeled RICO's civil action provision on a substantially similar provision in the Clayton Act, stating:

> The key to better interpretation lies in some statutory history. We have repeatedly observed, *see Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 150-51 (1987) . . . that Congress modeled § 1964(c) . . . [of RICO after] the federal antitrust laws, § 4 of the Clayton Act . . . .
>
> In *Associated General Contractors* . . . we discussed how Congress enacted § 4 in 1914 with language borrowed from § 7 of the Sherman Act, passed 24 years earlier. Before 1914, lower federal courts had read § 7 to incorporate common-law principles of proximate causation . . . and as we reasoned, as many lower federal courts had done before us . . . that congressional use of the § 7 language in § 4 presumably carried the intention to adopt 'the judicial gloss that avoided a simple literal interpretation.' . . . . Thus, we held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well.
>
> The reasoning applies just as readily to § 1964(c) [of RICO]. We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4 . . . . It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them.

*Holmes*, 503 U.S. at 267-68.

Nothing in *Holmes* undercuts the voluminous federal jurisprudence holding that courts may apply the indirect purchaser rule applies to RICO actions with the same force as in the antitrust context.

Additionally, this Court also does not find that the Third Circuit's decision in *In re Avandia Marketing, Sales Practices & Product Liability Litigation*, 804 F.3d 633 (3d Cir. 2015) compels the conclusion that Plaintiffs have standing because they suffered direct injury, despite the fact that they are indirect purchasers. Unlike here, the *Avandia* plaintiffs were not seeking recourse pursuant to payments made to third parties based on allegedly fraudulent prices set by a manufacturer. *Id.* at 644. Rather, the *Avandia* plaintiffs' cause of action was couched in the

defendants' alleged failure to disclose known health risks of various drugs ultimately included in formularies.[12] Similarly, the Supreme Court's holding in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) also does not preclude the application of the indirect purchaser rule to Plaintiffs' RICO claims. *Bridge* merely held that plaintiffs who are injured "by reason of" a pattern of mail fraud may have RICO standing "even if he [or she] has not relied on any misrepresentations." *Id.* at 649-50. Unlike here, *Bridge* does not concern the case of an indirect purchaser and does not stand for the proposition that plaintiffs multiple levels down the consumer chain may possess RICO standing despite the indirect purchaser rule.

At oral argument, Plaintiffs argued, *inter alia*, that none of the three reasons underlying the Supreme Court's justifications for the requirement of directness in *Holmes* – and thus underlying the indirect purchaser rule – is present in this scenario. Those reasons were: first, indirect injuries make it difficult "to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors"; second, the risk of multiple recoveries potentially requiring courts to "adopt complicated rules apportioning damages to guard against this risk"; and third, the likelihood of vindication by others, "since directly injured victims can generally be counted on to vindicate the law as private attorney generals." *Avandia*, 804 F.3d at 642 (quoting *Holmes*, 503 U.S. at 269-70). However, as in *Holmes*, allowing Plaintiffs' claims to proceed would create the risk of multiple recoveries, as each purchaser upstream from Plaintiffs could potentially recover from Defendants as well. Additionally, Plaintiffs' damages are not easily ascertainable in the context of this alleged kickback scheme, and although certain direct

---

[12] At oral argument, citing *Avandia*, 804 F.3d at 639-41, Plaintiffs' counsel invited this Court to be the first to re-label the indirect purchaser rule the "indirect injury" rule and subsequently determine their injuries were sufficiently direct to survive Defendants' Motion to Dismiss. Relying on the binding precedent in *McCarthy*, *Holmes*, and others, this Court declines to do so as Plaintiffs have failed to demonstrate circumstances warranting a departure from the precedent set and affirmed by authorities binding this Court.

purchasers may lack incentive in this instance, other intermediaries, such as the pharmacies, may have an incentive to seek recourse. Although Plaintiffs advocated competently against applying the indirect purchaser rule in this case, this Court is bound by the previous decisions of the Third Circuit and the Supreme Court and must recognize the indirect purchaser rule's bar to maintaining a RICO cause of action.[13]

Furthermore, the facts of this case notably mirror those of *Hale v. Stryker Orthopaedics*, 2009 WL 321579 at *3 (D.N.J. Feb. 9, 2009). The *Hale* plaintiffs asserted RICO violations pursuant to the defendants' alleged artificial price inflation of hip and knee implant devices, yet failed to allege that they directly purchased the subject products from the defendants. *Id.* at *1-4. Rather, the plaintiffs pled only that they suffered a direct injury evidenced by heightened coinsurance payments passed down to them through the distribution chain. Accordingly, the *Hale* court determined that the plaintiffs lacked RICO standing pursuant to the indirect purchaser rule, stating:

> While Plaintiffs argue that they have pled direct injury since they paid artificially-inflated coinsurance payments for their surgeries, Plaintiffs have not alleged that they were direct purchasers of the replacement joints manufactured by Defendants. Between Plaintiffs and Defendants in the chain of distribution stand several actors, including the hospitals performing the joint surgeries and Plaintiffs' insurers. The chain of distribution squarely presents the multiple liability and damage apportionment risks discussed in *McCarthy.* Thus, Plaintiffs' co-payment alone does not allow them to stand in the shoes of a direct purchaser for standing purposes.

---

[13] Additionally, this Court is not persuaded by Plaintiffs' argument at oral argument that any potential defendant could circumvent RICO liability by establishing a shell company and selling its product to that shell company before dispersing it to the general public, thereby wielding the indirect purchaser rule as a shield against potential litigation. However, the Supreme Court has interpreted the indirect purchaser rule to include a co-conspirator exception, whereby an indirect purchaser does have standing to sue when the direct purchaser is a division or subsidiary of the price-fixing seller or when customers of the direct purchaser own or control the direct purchaser itself. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 749 (9th Cir. 2012) (citing *Illinois Brick*, 431 U.S. at 736 n.16).

. . .

> After carefully considering the arguments put forth by both sides, it seems clear that under the facts as pled, Plaintiffs cannot escape the bar of the "direct purchaser" rule. To do so, Plaintiffs would have to plead that they bought their implants directly from Defendants. Since Plaintiffs have not so pled, they lack standing under these facts to bring their RICO claims.

*Id* at *4.

Although Plaintiffs allege injury through heightened coinsurance payments and fraudulent benchmark prices, the chain of distribution alleged in this matter is fatal to Plaintiff's RICO claims.[14] As Plaintiffs have failed to allege that they directly purchased the analog insulin from Defendants, but instead claim injury by virtue of inflated prices of their downstream purchase, their claims are barred by the indirect purchaser rule. As such, Plaintiffs lack standing to maintain their RICO causes of action and Defendants' Motion to Dismiss Plaintiffs' RICO claims is **GRANTED**.

### C.  State Consumer Protection Laws

Defendants contend Plaintiffs' state law consumer fraud claims – which include allegations of violations of the state consumer protection laws of Arizona, Delaware, Florida, Illinois, Minnesota, Missouri, New Jersey, and New Mexico – should be dismissed for lack of Article III standing, failure to state a claim, lack of proximate causation, and other independent

---

[14] Moreover, this Court notes a recent decision from this District, *In re Mercedes-Benz Emission Litig.*, No. 16-881, 2019 WL 413541 (D.N.J. Feb. 1, 2019), in which the court allowed RICO claims to persist despite the fact that the plaintiffs did not directly purchase the product, luxury automobiles, directly from the manufacturers. *Mercedes-Benz* is distinguishable from this case. Although the *Mercedes-Benz* plaintiffs were not direct purchasers, that matter did not concern overpayments made to and by intermediaries, as here. Rather, *Mercedes-Benz* dealt primarily with proximate causation in the RICO context, a separate requirement. Indeed, the court was not confronted with an indirect purchaser challenge to plaintiffs' standing, and it was neither briefed on the indirect purchaser rule nor did it perform an indirect purchaser rule analysis whatsoever. *Id.* at *18-26.

reasons. (ECF No. 71-1 at 33-37.) Plaintiffs counter that they have standing to pursue their state law claims as Defendants cite cases dealing with consumer class action certification, and the Amended Complaint adequately asserts facts supporting each state law claim. (ECF No. 75 at 30-38.)

First, Defendants contend Plaintiffs lack Article III standing to maintain their state law claims, arguing that Plaintiffs "do not plead a single specific fact indicating that their assignors suffered an injury in Arizona, Delaware, Florida, Illinois, Minnesota, Missouri, New Jersey, or New Mexico." (ECF No. 71-1 at 34.) Relying on *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010) for the proposition that plaintiffs lack standing to sue under state consumer protection laws if they did not purchase a drug in the state at issue, Defendants assert Plaintiffs lack standing for all of their state law claims. On the contrary, the Third Circuit has affirmed the certification of class actions in which plaintiffs have "allege[d] deceptive sales practices affecting . . . claimants throughout the fifty states" although plaintiffs themselves did not hail from such states. *In re Prudential Ins. Co. Am. Sales Practices Litig.*, 148 F.3d 284, 289 (3d Cir. 1998). Moreover, Plaintiffs have alleged they suffered an "injury-in-fact, ascertainable loss and actual damages . . . in the form of increased prices of the insulin products" in each state for which they assert a violation of the applicable consumer protection law. (ECF No. 70 ¶¶ 247, 258, 270, 284, 296, 306, 320, 332, 343.) Accordingly, Plaintiffs do not lack Article III standing to assert their state law consumer protection claims.

Second, Defendants contend the Amended Complaint "is devoid of factual allegations plausibly showing that defendants have violated the consumer protection laws at issue." (ECF No. 71-1 at 34.) Citing *McGarvey v. Penske*, 639 F. Supp. 2d 450, 465-66 (D.N.J. 2009), *vacated in part on reconsideration*, No. 08-5610, 2010 WL 1379967 (D.N.J. Mar. 29, 2010) and *In re*

*Suboxone Antitrust Litig.*, 2017 WL 4642285, at \*14 (E.D. Pa. Oct. 17, 2017), Defendants argue the state consumer protection laws must be dismissed as the Amended Complaint contains "no well-pled factual allegations" as to how Defendants violated each statute. (ECF No. 71-1 at 34-35.)

Both cases cited by Defendants are distinguishable from this case. *McGarvey* concerned plaintiffs who did "not even set forth the elements of [the] fifteen causes of action they assert . . . or explain how the fifteen listed statutes apply to this case." *McGarvey*, 639 F. Supp. 2d at 465. On the contrary, Plaintiffs have explicitly alleged each element of each of the state consumer law statutes. (ECF No. 70 ¶¶ 237-48, 250-57, 262-69, 274-83, 288-95, 299-305, 310-19, 322-31, 334-42.) Similarly, *In re Suboxone* does not provide support for Defendants' argument, as it dismissed plaintiffs' claims for "contain[ing] no well-pled factual allegations." *In re Suboxone*, 2017 WL 4642285, at \*14. Here, Plaintiffs have included sufficient factual allegations in the Amended Complaint establishing their respective state law claims. As such, Plaintiffs have drawn a sufficient connection between their allegations and the elements of the several consumer protection laws so as to satisfy the heightened pleading standard of the fraud-based causes of action.

Third, Defendants contend Plaintiffs "fail to adequately allege that defendants' conduct was the proximate cause of the harm asserted." (ECF No. 71-1 at 35-36.) Rather, Defendants maintain that the actions of Plaintiffs' Assignors and their own PBM agents determine the costs they incur for analog insulin, which is the harm alleged. (*Id.*) Conversely, Plaintiffs allege Defendants orchestrated the insulin pricing scheme with the PBMs, in which Defendants and the PBMs agreed on "three different prices for their insulin treatments: (1) a publicly-available "list" price, (2) a "discount" price . . . and – most importantly – (3) a "net" price that reflects a rebate []

that the Defendants will later pay to the PBMs [and] which neither the Defendants nor the PBMs will disclose." (ECF No. 70 ¶ 11.) Additionally, the Amended Complaint continues on to further explain, on many different occasions, how the Defendants' scheme causes injury to the Plaintiffs. (ECF No. 70 ¶¶ 19-20, 68-70, 92-104.) Accordingly, Plaintiffs have adequately pled proximate causation.

Fourth, Defendants argue that several of Plaintiffs' state law claims must be dismissed for independent reasons. (ECF No. 71-1 at 36-37.) Specifically, Defendants contend: (1) Plaintiffs lack standing under the Missouri Merchandising Practices Act ("MMPA") because the MMPA does not apply to plaintiffs who purchased products for commercial purposes; (2) Plaintiffs' New Jersey Consumer Fraud Act ("NJCFA") claims must be dismissed because the Plaintiffs' Assignors are not consumers; (3) Plaintiffs' claims under the Arizona Consumer Fraud Act ("ACFA") must be dismissed because they are not direct purchasers; and (4) Plaintiffs are barred from obtaining money damages under the Minnesota Deceptive Trade Practices Act ("DTPA"), which only authorizes injunctive relief. (*Id.*) This Court addresses each respective state statute in turn.

### i.    The MMPA

Under the MMPA, a "private cause of action is given only to one who purchases and suffers damages." *Jackson v. Charlie's Chevrolet, Inc.*, 664 S.W.2d 675, 677 (Mo. Ct. App. 1984); *see also* Mo. Rev. Stat. §§ 407.025.1. "[T]he word purchase 'is defined . . . as meaning to obtain by paying money or its equivalent.'" *In re Express Scripts, Inc., Pharmacy Benefits Mgmt. Litig.*, 2006 WL 2632328, at *10 (E.D. Mo. Sept. 13, 2006) (quoting *Jackson*, 664 S.W.2d at 677). In *In re Express Scripts*, the court held that the plaintiff, a PBA Plan that purchased services for its client police officers, lacked standing as the services were "not purchased for the

Plan's personal, family, or household purposes." *In re Express Scripts*, 2006 WL 2632328, at *10. Indeed, the court found "they were purchased for a business purpose: to serve the Plan's clients." *Id.* As such, plaintiffs could not survive defendants' motion to dismiss under a plain reading of the MMPA. *Id.* Here, Plaintiffs' cause of action pursuant to the MMPA suffers the same defect: the claim is brought on behalf of commercial purchasers rather than the consumers themselves. Plaintiffs' Assignors did not purchase the plans for "personal, family, or household purposes." *Id.* Accordingly, Plaintiffs' MMPA claim cannot withstand Defendants' Motion to Dismiss and therefore Plaintiffs' MMPA claim is **DISMISSED**.

### ii.    The NJCFA

Courts have interpreted the NJCFA to require the following three elements to state a viable cause of action: "(1) unlawful conduct by defendant; (2) an ascertainable loss by plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009) (citing *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007)). Third-party payors are not considered consumers under the NJCFA because they "do not use or consume prescription medications themselves." *Cent. Reg'l Empls. Benefit Fund v. Cephalon*, 2009 WL 3245485, at *3 (D.N.J. Oct. 7, 2009). Where the third-party payor "essentially serve[s]" as a middleman or insurer, they lack standing to maintain suit under the NJCFA. *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604, at *31-32 (D.N.J. July 10, 2009); *see also Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 560-62 (D.N.J. 2002). This case presents an identical issue to *Cephalon*: Plaintiffs'

Assignors do not use or consume the prescriptions but are third-party middlemen payors.[15] As such, Plaintiffs lack standing to maintain their NJCFA cause of action and therefore Plaintiffs' NJCFA claim is **DISMISSED**.

### iii.    The ACFA

Under the ACFA, a "subsequent purchaser is not within the class of consumers intended to be protected by the implied private cause of action[.]" *Sullivan v. Pulte Home Corp.*, 290 P.3d 446, 454 (Ariz. Ct. App. 2012), *vacated in part on other grounds*, 306 P.3d 1 (Ariz. 2013). Plaintiffs do not contest Defendants' construction of Arizona law but merely argue they are not "subsequent purchasers" and that Defendants are "hid[ing] under the shield of their delivery method." (ECF. No. 75 at 37.) On the contrary, Plaintiffs never allege they are the direct purchasers of the insulin from Defendants and readily admit that they are multiple purchasers down the chain of commerce. (ECF No. 70 ¶¶ 92-104.) Accordingly, Plaintiffs are subsequent purchasers for the purposes of the ACFA and as such, cannot maintain their ACFA cause of action against Defendants. Therefore, Plaintiffs' ACFA claim is **DISMISSED**.

### iv.    The DTPA

Finally, Plaintiffs and Defendants agree the DTPA disallows the recovery of monetary damages. However, the DTPA does provide for injunctive relief as well as the "award [of] attorney's fees to the prevailing party if . . . the party charged with a deceptive trade practice has willfully engaged in the trade practice knowing it to be deceptive." Minn. Stat. Section

---

[15] In their brief (ECF No. 75 at 36), Plaintiffs cite *Cephalon* for the proposition that the "nature of the transaction [and] not the identity of the purchaser, determines whether the NJCFA is applicable." *Cephalon*, 2009 WL 3245485, at *3. However, that statement was in reference to a matter involving a business entity, in which a court determined that such entity had NJCFA standing where it was the "'one who uses [the economic] goods.'" *Id.* (quoting *City Check Cashing, Inc. v. Nat'l State Bank*, 582 A.2d 809, 811 (N.J. App. Div. 1990)). Here, Plaintiffs' Assignors are not the ones using the prescription medication but are a quintessential middleman in the transaction.

325(d).45. As such, Plaintiffs may maintain their action pursuant to the DTPA as it relates to injunctive relief and attorney's fees, should they prevail and make the requisite showing.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' claims under the various state consumer protection laws is **GRANTED IN PART** and **DENIED IN PART**.[16]

### D.  Common Law Fraud

Defendants contend Plaintiffs have not stated a claim for common law fraud under New Jersey law. (ECF No. 71-1 at 37-38.) To state a claim for common law fraud under New Jersey law, a plaintiff must allege "(1) [the defendant made] a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) [the defendant had] an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Triffin v. Automatic Data Processing, Inc.*, 926 A.2d 362, 368 (N.J. Super. Ct. App. Div. 2007) (citing *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997)). New Jersey common law fraud claims are subject to the heightened pleading standard of Rule 9(b). *See Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 524 (D.N.J. 2008).

Plaintiffs have adequately pled each element necessary to establish a common law fraud cause of action. The Amended Complaint alleged material, factual misrepresentations (ECF No. 70 ¶¶ 4-20), knowledge by Defendants of the misrepresentations (*id.* ¶¶ 4-20), that Defendants intended for consumers of their analog insulin to rely on the fraudulent prices (*id.* ¶¶ 92-114), that Plaintiffs' Assignors relied on the prices (*id.* ¶¶ 20-29), and damages stemming therefrom.

---

[16] Plaintiffs included all of their state consumer protection law causes of action in one count, Count Three. Defendants' Motion to Dismiss Count Three is granted with respect to the allegations brought under the consumer protection laws of Missouri, New Jersey, and Arizona. Defendants' Motion to Dismiss Count Three is denied with respect to Plaintiffs' allegations pursuant to the consumer protection laws of Delaware, Florida, Illinois, and New Mexico, as well as the Minnesota Prevention of Consumer Fraud Act. Plaintiffs may maintain their DTPA action only as it seeks injunctive relief and attorneys' fees.

(*id.* ¶¶ 34-35, 113-24).

Defendants' reliance on *Dewey* to argue that the Amended Complaint did not allege reasonable reliance on its misrepresentations is misplaced. (ECF No. 71-1 at 37-38.) Defendants argue the Amended Complaint "does not identify any specific purported misrepresentations that defendants directed to plaintiffs' assignors." (*id.* at 37.) On the contrary, the Amended Complaint pled a fraudulent pricing scheme by virtue of misrepresentations of list prices, on which Defendants had reason to know that the public – and any consumer of their insulin – would rely. (ECF No. 70 ¶¶ 92-104.) Moreover, *Dewey* held "general allegations of reliance are sufficient in light of the fact that the specific facts as to the misrepresentations are Defendants' control, not Plaintiff's." *Dewey*, 558 F. Supp. 2d at 526. Here, the Amended Complaint certainly alleges, at a minimum, "general allegations" of misrepresentations. Accordingly, as each of the elements of a common law fraud claim are adequately pled in the Amended Complaint, Defendants' Motion to Dismiss Plaintiffs' common law fraud claim is **DENIED.**

### E.  Unjust Enrichment

Finally, Defendants argue Plaintiffs have not stated a claim for unjust enrichment. (ECF No. 71-1 at 38-40.) Specifically, Defendants contend Plaintiffs have not adequately alleged Defendants were unjustly enriched, Plaintiffs did not allege they conferred any direct benefits on Defendants, Plaintiffs' claims are barred by the voluntary payment doctrine, and Plaintiffs' claims are barred by virtue of the enforceable contract governing the subject matter. (ECF No. 71-1 at 39-40.) "Unjust enrichment is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability." *Nat'l Amusements, Inc. v. N.J. Tpk. Auth.*, 261 N.J. Super. 468, 478 (Law Div. 1992), *aff'd*, 275 N.J. Super. 134 (App. Div. 1994). "The duty which forms the foundation of a quasi-contractual obligations rests on the equitable principle that a person

shall not be allowed to enrich himself at the expense of another." *Id.* To establish a claim for unjust enrichment under New Jersey law, "a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994). Restitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law. *Nat'l Amusements, Inc.*, 261 N.J Super. at 478; *Am. Rubber & Metal Hose Co. v. Strahman Valves, Inc.*, Civ. No. 11-1279, 2011 WL 3022243, at *8 (D.N.J. July 22, 2011).

Although Plaintiffs have alleged that Defendants' fraudulent misrepresentations in setting the list prices resulted in an unjust enrichment of Defendants at the Plaintiffs' expense (ECF No. 70 ¶¶ 1-35, 57-104, 306-12), they cannot maintain their common law unjust enrichment claim because they were indirect purchasers of the analog insulin. "Under New Jersey law, an indirect purchaser cannot succeed on a claim for unjust enrichment." *Weske v. Samsung Elecs.*, Civ. No. 10-4811, 2012 WL 833003, at *7 (D.N.J. Mar. 12, 2012). "When an individual purchases a consumer product from a third-party [seller] and not the manufacturer, the purchaser has not conferred a benefit directly to the manufacturer such that the manufacturer could be found to be unjustly enriched." *Id.* (citing *Hughes v. Panasonic Consumer Elecs., Co.*, 2011 WL 2976839, at *27 (D.N.J. July 11, 2011)). Here, Plaintiffs conceded they are not direct purchasers of the analog insulin. Rather, Plaintiffs outline a scheme whereby the analog insulin is sold to wholesalers at prices based on the benchmark prices that are set by the manufacturers and are subsequently sold to pharmacies and clinics at prices that approximate the benchmark prices. (ECF No. 70 ¶¶ 96-104.) As such, Plaintiffs are multiple purchasers down the distribution chain from Defendants and cannot sustain their unjust enrichment claim against Defendants. Accordingly, Defendants' Motion to Dismiss Plaintiffs' unjust enrichment claim is **GRANTED**.

**IV.    CONCLUSION**

For the reasons set forth above, Defendants' Motion to Dismiss the Amended Complaint for lack of Article III standing is **DENIED**; Defendants' Motion to Dismiss Plaintiffs' RICO claims is **GRANTED**; Defendants' Motion to Dismiss Plaintiffs' state consumer protection law causes of action is **GRANTED** with respect to Missouri, Arizona, and New Jersey law and **DENIED** with respect to Minnesota, Delaware, Florida, Illinois, and New Mexico law; Defendants' Motion to Dismiss Plaintiffs' common law fraud claim is **DENIED**; and Defendants' Motion to Dismiss Plaintiffs' unjust enrichment claim is **GRANTED**.


**Date: March 29, 2019**                    */s/ Brian R. Martinotti*
                                            **HON. BRIAN R. MARTINOTTI**
                                            **UNITED STATES DISTRICT JUDGE**