<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| MSP RECOVERY CLAIMS, SERIES, LLC, MAO-MSO RECOVERY II, LLC, SERIES PMPI, and MSPA CLAIMS 1, LLC, | : : : : | |
| Plaintiffs, | : : | Case No. 3:18-cv-2211(BRM)(LHG) |
| v. | : : | **OPINION** |
| SANOFI-AVENTIS U.S. LLC, NOVO NORDISK INC., and ELI LILLY AND COMPANY | : : : : | |
| Defendants. | : : | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendants Sanofi-Aventis U.S. LLC ("Sanofi-Aventis"), Novo Nordisk Inc. ("Novo Nordisk"), and Eli Lilly and Company's ("Eli Lilly") (collectively, "Defendants") Motion to Dismiss Plaintiffs MSP Recovery Claims ("MSP Recovery"), Series, LLC ("Series"), MAO-MSO Recovery II, LLC, Series PMPI ("MAO-MSO"), and MSPA Claims 1, LLC's ("MSPA") (collectively, "Plaintiffs") Second Amended Complaint for failure to state a claim with respect to each cause of action asserted. (ECF No. 97.) Plaintiffs oppose Defendants' Motion to Dismiss. (ECF No. 102.) Having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b) and having reviewed the submissions filed in connection with the motion, for the reasons set forth below and for good cause shown, Defendants' Motion to Dismiss is **GRANTED IN PART and DENIED IN PART**.

## I.    BACKGROUND[1]

### A.    Procedural History

On February 15, 2018, Plaintiffs filed a Complaint before this Court asserting various causes of action against Defendants. (ECF No. 1.) On July 18, 2018, Plaintiffs filed a First Amended Complaint (the "Amended Complaint"), asserting violations of 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against all Defendants (Count One), conspiracy to violate RICO pursuant to 18 U.S.C. § 1962(d) against all Defendants (Count Two), violations of ten state law consumer fraud statutes (Count Three)[2] against all defendants, against all Defendants, common law fraud against all Defendants (Count Four), and common law unjust enrichment against all Defendants (Count Five). (ECF No. 70.)

On August 20, 2018, Defendants filed a Motion to Dismiss the Amended Complaint (ECF No. 71) asserting Plaintiffs lacked Article III standing, failed to state a RICO claim, failed to state claims under the various state consumer protection laws, failed to state a claim for common law fraud, and failed to state a claim for common law unjust enrichment. (ECF No. 71-1 at 13-41.) On March 29, 2019, the Court issued an Opinion granting in part and denying in part Defendants' Motion to Dismiss the Amended Complaint. (ECF No. 89.)

---

[1] The factual and procedural backgrounds of this matter are well known to the parties and were previously recounted by the Court in its Opinion granting in part and denying in part Defendants' Motion to Dismiss the Amended Complaint. (ECF No. 89.) The Court, therefore, only includes the facts and procedural background relevant to this Motion.

[2] Plaintiffs alleged violations of the Arizona Consumer Fraud Act, Delaware Consumer Fraud Act, Florida Deceptive and Unfair Practice Act, Illinois Consumer Fraud and Deceptive Business Practices Act, Minnesota Prevention of Consumer Fraud Act, Minnesota Uniform Deceptive Trade Practices Act, Missouri Merchandising Practices Act, the New Jersey Consumer Fraud Act, and the New Mexico Unfair Trade Practices Act.

On April 29, 2019, Plaintiffs filed a Second Amended Complaint (the "Second Amended Complaint") asserting violations of RICO against all Defendants (Count One), conspiracy to violate RICO pursuant to 18 U.S.C. § 1962(d) against all Defendants (Count Two), violations of the Alaska Unfair Trade Practices and Consumer Protections Laws, Arizona Consumer Fraud Act, Arkansas Deceptive Trade Practices Act, Connecticut Unfair Trade Practices Act, Delaware Consumer Fraud Act, Florida Deceptive and Unfair Trade Practices Act, Hawaii Unfair or Deceptive Acts and Practices, Idaho Consumer Protection Act, Indiana Deceptive Consumer Sales Act, Massachusetts Regulation of Business Practice & Consumer Protection Act, Michigan Consumer Protection Act, Minnesota Private Attorney General Statute & Consumer Fraud Act, Minnesota Uniform Deceptive Trade Practices Act, Nebraska Consumer Protection Act, Nevada Deceptive Trade Practices Act, New Hampshire Consumer Protection Act, New Mexico Unfair Trade Practices Act, New York General Business Law, North Dakota Consumer Fraud Act, Ohio Deceptive Trade Practices Act, Pennsylvania Unfair Trade Practices and Consumer Protection Law, South Carolina Unfair Trade Practices Act, South Dakota Deceptive Trade Practices and Consumer Protection Law, Tennessee Consumer Protection Act, Virginia Consumer Protection Act of 1977, West Virginia Consumer Credit and Protection Act, and the Wisconsin Deceptive Trade Practices Act (Count Four), New Jersey Common Law Fraud against Defendants Sanofi and Novo Nordisk (Count Five), Indiana Common Law Fraud against Defendant Eli Lilly (Count Six), Common Law Unjust Enrichment against all Defendants (Count Seven), and equitable relief pursuant to 18 U.S.C. § 1964(a) (Count Three). (ECF No. 91.)

On June 28, 2019 Defendants filed a Partial Motion to Dismiss the Second Amended

3

Complaint ("Motion to Dismiss") asserting Plaintiffs failed to state a RICO claim, failed to state a claim for equitable relief under RICO, and failed to state claims under all but two of the various state consumer protection laws. (ECF No. 97-1 at 6-36.) On August 12, 2019, Plaintiffs filed an Opposition to Defendants' Partial Motion to Dismiss. (ECF No. 102.) On September 26, 2019, Defendants filed a Reply Brief to Plaintiffs' Opposition. (ECF No. 105.)

### B.   Factual Background[3]

### 1.   Parties and Background

MSP Recovery is a Delaware entity with its principal place of business in Coral Gables, Florida (ECF No. 91 ¶ 44), MSPA is a Florida entity with its principal place of business in Coral Gables, Florida (ECF No. 91 ¶ 45), and MAO-MSO is a Delaware entity with its principal place of business in Cresskill, New Jersey. (*Id.* ¶ 46). Plaintiffs have been assigned recovery rights for multiple Medicare Advantage plans, including various Medicare Advantage organizations ("MAOs"), health maintenance organizations ("HMOs"), and management service organizations ("MSOs") (collectively, "Plaintiffs' Assignors"). (*Id.*¶ 47.) Plaintiffs' Assignors paid Medicare benefits on behalf of Medicare-eligible beneficiaries enrolled under the Medicare Advantage program. (ECF No. 91 ¶ 48.)

Sanofi-Aventis is a Delaware limited liability company headquartered in Bridgewater, New Jersey. (*Id.* ¶ 49.) Sanofi-Aventis manufactures Apidra, a rapid-acting insulin, and Lantus, a

---

[3] For the purpose of a motion to dismiss, the Court accepts the factual allegations in the complaint as true and draws all inferences in the light most favorable to the plaintiff. *See Phillips v. City of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Furthermore, the Court also considers any "document integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

long-acting insulin. (*Id.*) Novo Nordisk is a Delaware corporation headquartered in Plainsboro, New Jersey. (*Id.* ¶ 50.) Novo Nordisk manufactures NovoLog, a rapid-acting insulin, and Levemir, a long-acting insulin. (*Id.*) Eli Lilly is an Indiana corporation headquartered in Indianapolis, Indiana. (*Id.* ¶ 51.) Eli Lilly produces the rapid-acting insulin Humalog and "markets, distributes, and sells its products throughout the state of New Jersey," maintaining a registered agent in West Trenton, New Jersey. (*Id.*) The insulin medications at issue in this complaint are the above drugs along with Toujeo, Humulin R., and Humulin N. (the "Subject Insulins"). (*Id.* ¶ 3.)

Approximately 30 million people in the United States suffer from diabetes. (*Id.* ¶ 1.) Diabetes is a condition in which the body does not properly process food for use as energy. (*Id.* ¶ 64.) People suffering from diabetes are unable to produce enough insulin, or cannot use insulin as effectively as necessary, and therefore have high levels of glucose in their blood stream which poses serious or fatal health risks. (*Id.* ¶¶ 66-67.) Plaintiffs' Assignors have paid for over one million prescriptions of insulin in the past ten years. (*Id.* ¶ 70.)

Since 2003, the cost of one vial of insulin or one box of five insulin pens has increased by more than 500%, grossly incommensurate with the rate of medical inflation. (*Id.* ¶ 72.) This has occurred "even in the face of supposed competition between manufacturers with similar drugs." (*Id.* ¶ 73.)

### 2.    Medicare

Plaintiffs are the assignees of Medicare Act Part C and/or Part D prescription drug coverage providers who provide benefits to thousands of beneficiaries. (*Id.* ¶ 78.) The Medicare Act consists of five parts, A through E. 42 U.S.C. § 1395 *et seq*. Medicare Parts A and B create and regulate traditional fee-for-service Medicare. 42 U.S.C. §§ 1395c-1395w. Medicare Part C outlines the

Medicare Advantage Program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits to them, 42 U.S.C. §§ 1395w-21-29, whereas Medicare Part D provides for prescription drug coverage to Medicare beneficiaries, 42 U.S.C. §§ 1395x, 1395y.

Medicare does not directly offer prescription drug coverage to its beneficiaries. (*Id.* ¶ 85.) Instead, prescription drug coverage is an optional benefit provided by insurance companies and other private companies approved by the Centers for Medicare and Medicaid Services ("CMS"). (*Id.*) Medicare beneficiaries have two options for obtaining Part D prescription drug coverage: (1) through a Medicare Advantage Plan ("MA Plan") that offers Part C benefits as well as prescription coverage; or through a separate Prescription Drug Plan. (*Id.* ¶ 86.) Plans that provide Part D coverage must "provide qualified prescription drug coverage" which includes "standard prescription drug coverage" or "alternative prescription drug coverage." (*Id.* ¶ 88.) Additionally, Part D has an out-of-pocket expenditure limit of $5,100.00. (*Id.* ¶ 89.) Once a beneficiary has reached this limit, the MA Plan covers most of the remaining medication costs. (*Id.*) Some plans, however, may require a deductible to be met prior to paying for drug coverage, and during this time the beneficiary pays for all prescription costs. (*Id.* ¶ 90.)

Once the deductible is met, the initial coverage period begins, and the beneficiary pays a portion of the drug's cost while the MA Plan pays the remainder. (*Id.* ¶ 91.) Here, the beneficiary will have to pay either a copayment or coinsurance. (*Id.*) A copayment is a standard payment amount based on what tier the MA Plan places the drug in (e.g., $50 for brand-name Tier 1 drugs, $25 for brand-name Tier 2 drugs). (*Id.*) A coinsurance means the beneficiary will pay a percentage (e.g., 25%) of the drug's total cost. (*Id.*)

6

Most Part D plans have a coverage gap called the "Donut Hole," where there is a temporary limit on what the plan will cover. (*Id.* ¶ 92.) As of 2019, the coverage gap begins after a beneficiary has spent $3,820 on prescriptions. (*Id.*) Once the gap begins, the beneficiary pays 25% of the price for brand name rugs and 37% of the price for generic drugs, while the MA plan pays the rest of the costs. (*Id.* ¶ 93.) However, the coverage gap ends once the MA plan and beneficiary have spent $5,100 on prescriptions. (*Id.* ¶ 95.) At this point the beneficiary will receive "catastrophic coverage," and therefore will only pay their copayment or coinsurance amount for the rest of the year. (*Id.*)

### 3.    The Insulin Pricing Scheme

Plaintiffs contend the prices Plaintiffs' Assignors paid and continue to pay for Defendants' analog insulins are inflated because of Defendants' "insulin pricing scheme" ("Insulin Pricing Scheme"). (*Id.* ¶ 96.) The alleged insulin pricing scheme causes third-party payers ("TPPs") "to pay for both the drug and the undisclosed kickback to the PBMs[4]." (*Id.*) PBMs perform a variety of roles in the pharmaceutical supply chain. (*Id.* ¶ 17.) Namely, they contract with TPPs to: (1) develop and maintain drug formularies; (2) contract with pharmacies; (3) negotiate discounts and rebates with drug manufacturers; and (4) process and pay prescription drug claims. (*Id.*) Defendants have kept confidential the details of this scheme from Plaintiffs' Assignors. (*Id.* ¶ 97.)

The pharmaceutical supply chain in the United States consist of four major actors: drug manufacturers, wholesale distributors, pharmacies, and PBMs. (*Id.* ¶ 98.) Pharmaceuticals generally originate in manufacturing sites and are then transferred to wholesale distributors before

---

[4] Pharmacy Benefit Managers.

being transferred to retail or mail-order pharmacies, where they are subject to price negotiations and processed through management screens by PBMs. (*Id.* ¶ 99.) Thereafter, the drugs are dispensed by pharmacies where they are purchased by the beneficiaries. (*Id.*) PBMs are "pa[id] to administer [a TTP's] drug programs," which include developing the drug formulary. *Id.* ¶ 100.) TPPs provide copies of their PBMs' formularies to providers, pharmacists, and patients in their network to aid prescribers' adherence to the formularies. (*Id.* ¶ 104.)

Formulary inclusion is critical to Defendants' business, as it results in increased drug sales, including the Subject Insulins. (*Id.* ¶ 106.) Being included in a formulary and obtaining "favorable placement" within a formulary ("Tier-1 placement") drives demand for that drug within the network of physicians, pharmacists, and participating plans. (*Id.* ¶ 105.) PBMs have contractual relationships with drug manufacturers, retail pharmacies, and wholesalers whereby they negotiate rebates and other fees and concessions. (*Id.* ¶ 108.) These relationships "allow PBMs to exert tremendous influence and control over which drugs are made available to health plans and ultimately the public." (*Id.* ¶ 109.)

PBMs generate revenue in three ways: (1) fees from TPPs for processing prescriptions and operating mail-order pharmacies, (2) transaction fees from TTPs on different operations required to manage cash flow between insurers and manufacturers, and (3) through rebates from pharmaceutical manufacturers such as Defendants. (*Id.* ¶ 117.) Therefore, PBMs have the greatest leverage to negotiate lower prices when two or more manufacturers make interchangeable prices. (*Id.* ¶ 118.) The rebate agreement would create an incentive for PBMs to negotiate lower net prices "if operated ethically and honestly." (*Id.* ¶ 120.) Instead, "Defendants and PBMs discovered that they both benefit if . . . Defendants can raise their publicly

8

reported List price, while maintaining nearly constant net prices." (*Id.* ¶ 122.) This scheme allows PBMs to leverage formulary control in exchange for kickbacks, while also allowing Defendants to maintain or increase their profit margins while preserving preferred, Tier-1 formulary positions. (*Id.* ¶ 123.)

Although Defendants have sold similar, interchangeable drugs for decades, the list prices of these drugs ("List Prices") have continued to rise in tandem. (*Id.* ¶ 128.) This occurs because Defendants are not competing on price, but rather on higher rebates and fees paid to PBMs. (*Id.* ¶ 129.) This has caused the list price of insulin to rise while the net realized prices for Defendants has remained "relatively constant." (ECF No. 91 ¶¶ 130-34.)

When a PBM combines with a pharmacy, they lose the incentive to police against pharmaceutical company schemes to steer patients to more expensive analog drugs. (*Id.* ¶ 145.) The size of the rebates and other fees PBMs attract from drug companies is a "carefully guarded secret." (*Id.* ¶ 143.) PBMs "depend on the lack of transparency to conduct their business" and resist "any requirement that they disclose the details of their agreements with drug manufacturers." *Id.* ¶ 144.)

On November 30, 2016, Novo Nordisk issued a press release explaining the rising price of insulin prices and their continually rising revenue, stating:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make . . . . News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "list price" increases we've made over the last decade. In other words, a list price increase by XX percent leads to an automatic XX percent profit for the drug maker. We believe that is misleading and here's why: As the manufacturer, we do set the "list price" and have full accountability for those increases. However, after we set the list

> price, we negotiate with the companies that actually pay for the medicines, which we call payers. This is necessary in order for our medicines to stay on their preferred drug list or formulary. The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price." The net price more closely reflects our actual profits.

(*Id.* ¶ 151.)

Additionally, in its 2016 annual report, Novo Nordisk admitted to the practice of exchanging rebates for preferential formulary placement, stating:

> Increasingly, PBMs and health plans play a key role in negotiating price concessions with drug manufacturers on behalf of private payers for both the commercial and government channels and determining the list of drugs covered in the health plan's formulary. Specifically, . . . Payer pressure to reduce the overall drug costs has resulted in greater focus on negotiating higher rebates from drug manufacturers. Private payers are increasingly keen to adopt narrow formularies that exclude certain drugs, while securing increased rebates from the preferred brand.

(*Id.* ¶ 152.)

Consequently, Novo Nordisk's 2016 annual report announced contract negotiations for 2017 with "higher than anticipated rebates purportedly necessary to obtain broader coverage for its products. (*Id.* ¶ 153.)

Similarly, Eli Lilly and Sanofi-Aventis also admitted they raise their list prices on a *quid pro quo* basis in exchange for including their products on preferred drug formularies. (*Id.* ¶¶ 154-56.) Eli Lilly's CEO explicitly conceded "higher rebates can be an incentive for a payer to stick with . . . essentially a higher-priced product." (*Id.* ¶ 155.) Meanwhile, Sanofi-Aventis made a similar admission, with its CEO noting "increased rebates in the U.S. to secure favorable formula repositions for Lantus with key payers have kicked in since January 1, 2015" (*Id.* ¶ 156.) As such,

10

Plaintiffs assert the Insulin Pricing Scheme benefits Defendants and PBMs at the expense of the public, including TPPs, MAOs, and the Medicare Trust Fund. (*Id.* ¶ 163.) Defendants' scheme results in TPPs, including Plaintiffs' Assignors, being saddled with increasing costs based on inflated prices with MA Plans being powerless in maximizing benefits for their beneficiaries prior to the donut hole. (*Id.* ¶ 164.)

Defendants "deliberately and intentionally" published List Prices for the Subject Insulins that do not reflect the actual market prices of the drugs. (*Id.* ¶ 169.) Instead, the List Prices "are fabricated overstatements to create a net-to-List Price spread that Defendants market to PBMs in exchange for formulary status." (*Id.*) Without the fraudulent scheme, Defendants would be forced to compete for favorable formulary placement by lowering prices. (*Id.*) Rather, Defendants "closely guard their pricing structures and insulin sales figures" such that they "ke[pt] the net prices offered to the PBMs a secret." (*Id.* ¶ 170.) As a result of Defendants' Insulin Pricing Scheme, Plaintiffs' Assignors have overpaid for analog insulin for their beneficiaries, thereby depleting finite resources available to provide MA Plan benefits. (*Id.* ¶ 173.)

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a . . . motion to dismiss does not need detailed factual allegations." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

While as a general rule, a court many not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to 12(b)(6), the Third Circuit has held "a court may

consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant under Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

### B.    Rule 9(b)

Pursuant to Federal Rule of Civil Procedure 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake, although intent, knowledge, and other conditions of a person's mind may be alleged generally." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (citations omitted); *see also U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (holding that a "plaintiff alleging fraud must . . . support its allegations with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue") (citations omitted). Accordingly, "a party must plead [its] claim with enough particularity to place defendants on notice of the 'precise misconduct with which they are charged.'" *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004), *abrogated on other grounds by Twombly*, 550 U.S. at 557.

## III.    DECISION

### A.    Standing of Unidentified Assignors

Defendants contend Plaintiffs should not be able to assert claims on behalf of assignors not identified in the Second Amended Complaint. (ECF No. 97-1 at 15.) As such, Defendants argue Plaintiffs claims should be limited to the specific assignments identified in the Second Amended Complaint and other claims should not be allowed because Plaintiffs have not attached and added details about each assignment. (*Id.*) Plaintiffs, however, contend they are not required to allege specific details of each of its assignors and attach each assignment agreement to the Second Amended Complaint. (ECF No. 102 at 11.)

This Court has already found Plaintiffs sufficiently pleaded claims of assignments to withstand Defendants' Motion to Dismiss. (ECF No. 89 at 14.) Defendants, however, are not challenging the standing of the identified assignors. (*See generally* ECF No. 97-1 at 15-18.) They first contend allowing claims from unnamed assignors at this stage would lead to insufficient litigation. In so arguing, Defendants rely on *Desai v. Sorin CRM USA, Inc.*, which states "a plaintiff must successfully plead a claim before obtaining discovery, and not the other way around." 2013 WL 163298, at *7 (D.N.J. Jan. 15, 2013). However, the claims dismissed in *Desai* were not based on a properly pleaded claim. *Id.* at *19. Because this Court has found Plaintiffs' claims meet the minimum pleading standards, Defendants reliance on this case is inapposite.

Additionally, Defendants have improperly relied on *Animal Science Products, Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465 (D.N.J. 2014). The standing question in that case did not involve Article III standing, and as such, those conclusions of law are inapplicable in this case.

Finally, many other district courts across the country have not required plaintiffs to add

14

detailed allegations at this stage to assert claims for all assignors. *See, e.g.*, *MSP Recovery, LLC v. Allstate Ins. Co.*, 835 F.3d 1351 (11th Cir. 2016); *MSP Recovery Claims, Series LLC v. AIX Specialty Ins. Co.*, 2019 WL 2211092 (M.D. Fla. May 22, 2019*)*; *MSP Recovery Claims, Series LLC v. Farmers Ins. Exch.*, Nos. 17-02522, 17-02559 (C.D. Cal. August 13, 2018), *MAO-MSO Recovery II v. State Farm Mut. Auto. Ins. Co.*, No. 17-01537, 2018 WL 3420796 (C.D. Ill. July 13, 2018), *MAO-MSO Recovery II, LLC v. Mercury Gen.*, Nos. 17-02525, 17-02556 (C.D. Cal. May 23, 2018), *MAO-MSO Recovery II, LLC v. Infinity Prop. & Cas. Grp.*, No. 17-00513, 2018 WL 1244498 (N.D. Ala. Mar. 9, 2018), *MAO–MSO Recovery II, LLC v. Gov't Emps. Ins. Co. ("GEICO")*, Nos. 17–711, 17-964, 2018 WL 999920 (D. Md. Feb. 21, 2018). Accordingly, Defendants' Motion to limit Plaintiffs' claims to the three exemplar assignors alleged in the Second Amended Complaint is **DENIED.**

### B.    RICO Violation Claims

#### 1.    RICO Damages Claims

Defendants contend Plaintiffs' RICO claims fail because this Court has already held the indirect purchaser rule precludes Plaintiffs from seeking damages under RICO. (ECF No. 97-1 at 18.) Plaintiffs, however, argue the TPPs have standing to sue under RICO based on *In re Avandia Mktg.*, 804 F.3d 633 (3d Cir. 2015). (ECF No. 102 at 23.)

In its March 29, 2019 Opinion, this Court held the indirect purchaser rule precludes Plaintiffs from seeking damages under RICO. (ECF No. 89 at 32.) Additionally, this Court specifically rejected Plaintiffs' application of *Avandia*, finding the case did not compel "the conclusion that Plaintiffs have standing because they suffered a direct injury, despite the fact that they were indirect purchasers." (*Id.*) Further, this Court explained, "[u]nlike here, the *Avandia*

15

plaintiffs were not seeking recourse pursuant to payments made to third parties based on allegedly fraudulent prices set by a manufacturer." (*Id.* at 29.)

Ultimately, Plaintiffs are requesting this Court reconsider its prior decision. Without a formal Motion for Reconsideration, this Court may not revisit its previous decision. *See Perrotta v. LG Elecs. USA, Inc.*, 2013 WL 44446975, at *6 (D.N.J. Aug. 15, 2013) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); *see also Surina v. S. River Bd. of Educ.*, 2019 WL 1916206, at *5 (D.N.J. Apr. 30, 2019) (citing *Pub. Interest Res. Grp. of N.J., Inc. v. Magnesium Elektron Inc.*, 123 F.3d 111, 116 (3d Cir. 1997) (finding the "law of the case" doctrine "directs courts to refrain from re-deciding issues that were resolved earlier in the litigation"). Accordingly, the Defendants' Motion to Dismiss Plaintiffs' RICO claims is **GRANTED.**

### 2.    RICO Injunction

Defendants contend Plaintiffs' RICO claim for an injunction should be dismissed because RICO does not grant private plaintiffs a right of action for injunctive relief. (ECF No. 97-1 at 21.) Defendants also contend—and Plaintiffs agree—no court in this District has held that a private party has a right to equitable relief under RICO. (ECF No. 97-1 at 21 and ECF No. 102 at 25.)

The Third Circuit has not directly addressed whether RICO allows for a private right of equitable relief. However, several Courts within this circuit have affirmatively held RICO does not establish a private right of equitable relief. *See Curley v. Cumberland Farms Dairy, Inc.*, 728 F. Supp. 1123, 1137 (D.N.J. 1989); *see also Futterknecht v. Thurber*, 2015 WL 4603010, at *4 (D.N.J. July 30, 2015); *Johnson Dev. Grp., Inc. v. Carpenters Local Union No. 1578*, 728 F. Supp. 1142, 1146 (D.N.J. 1990) (noting in dicta that RICO "makes no provision for private equitable

relief"). These cases came to this conclusion by analyzing both the legislative history of RICO and the Department of Justice's Manual. *See, e.g. Futterknecht*, 2015 WL 4603010, at *4.

Despite this, Plaintiffs urge this Court to consider two opinions from this Circuit that demonstrate "the issue is not [as] clear cut as Defendants argue." First, Plaintiffs cite *Adamo v. Jones*, No. 15-1073, 2016 WL 356031, at *12 (D.N.J. Jan. 29, 2016), which held it "is not clear whether injunctive or equitable relief is available." Additionally, Plaintiffs cite *Kaul v. Christie*, *appeal docketed*, No. 16-2364, 2019 WL 943656, at *28 n.40 (D.N.J. Feb. 24, 2019), where, in a footnote Judge McNulty stated, "for the purposes of argument going forward, I assume that a plaintiff may obtain injunctive relief under RICO." However, neither of these cases explicitly held a private party may obtain equitable relief under RICO. As such, this Court declines to stray from the weight of persuasive authority and holds that a private party may not seek equitable relief under RICO. Accordingly, Defendants' Motion to Dismiss Plaintiffs' request for injunctive relief under RICO is **GRANTED.**

### C.    State Law Claims

#### 1.    Article III Standing

Defendants contend all but two of Plaintiffs' state law claims should be dismissed for lack of standing because the Second Amended Complaint does not allege the three named assignors reside in or were reimbursed for Defendants' insulin in those states. (ECF No. 97-1 at 27.) Defendants cite this Court's opinion in *In re Insulin Pricing*, which held "named plaintiffs in a class action 'lack standing to bring claims on behalf of putative classes under laws of states where no named plaintiff is located and where no named plaintiff purchased the product at issue.'" *In re Insulin Pricing Litig.*, No. 17-0699, 2019 U.S. Dist. LEXIS 25185, at *17 (D.N.J. Feb. 15, 2019).

Plaintiffs argue they have standing to pursue their state law claims because data in Exhibit A—which is attached to the Second Amended Complaint—shows purchases and reimbursements for insulin including the state where the insulin was purchased. (ECF No. 102 at 34.) Additionally, Plaintiffs contend Defendants' reliance on *Insulin Pricing* is inappropriate because Plaintiffs are bringing claims on behalf of themselves rather than a class. (*Id.* at 35.) The Court agrees. Defendants have not offered adequate reasoning why the class action case they cite is applicable here. Rather, they simply state, "[t]he fact that *Insulin Pricing* is a putative class action does not alter the applicability of its holding here." (ECF No. 97-1 at 28.) In its March 29, 2019 Opinion, this Court found Plaintiffs alleged they suffered an injury in the form of increased insulin prices in each state for which they assert a violation of the applicable consumer protection law. (ECF No. 89 at 33.) That remains the same. Exhibit A shows purchases and reimbursements for insulin in each state that Plaintiffs put forth a state law claim. Additionally, Plaintiffs properly claim they have suffered an injury-in-fact, ascertainable loss, and actual damages in the form of increased prices of the Subject Insulin for each state they mention in the Second Amended Complaint. Accordingly, Defendants' Motion to Dismiss all but two of Plaintiffs' state law claims for lack of Article III standing is **DENIED.**

## 2.    Third Party Payer Standing

Defendants contend eight of Plaintiffs' state law claims—Hawaii, Michigan, New York, Pennsylvania, Virginia, West Virginia, and Wisconsin—fail because Plaintiffs' Assignors are not consumers. (ECF No. 97-1 at 30.) The specific state law claims will be discussed in turn.

###### i.    Hawaii

Defendants contend Plaintiffs' lack standing to pursue a claim under the Hawaii Unfair or Deceptive Acts and Practices statute ("Hawaii UDAP"). (ECF No. 97-1 at 31.) The Hawaii UDAP states "[n]o person other than a consumer, the attorney general, or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section." HAW. REV. STAT. § 480-2(d). Additionally, a "consumer" is defined as "a natural person who, primarily for personal, family, or household purposes, purchases . . . goods or services." *Id.* § 480-1. Defendants contend Plaintiffs lack standing because they are not "consumers" under the statutory definition. (ECF No. 97-1 at 31.)

There are two distinct causes of action under § 480-2(a) of the Hawaii UDAP: (1) claims alleging unfair methods of competition; and (2) claims alleging unfair or deceptive acts or practices. *Kam Ctr. Specialty Corp v. LWC IV Corp.*, 2007 Haw. LEXIS 283, at *24 (Haw. 2007) (citing *Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc.*, 148 P.3d 1179, 1211 (Haw. 2006)). Further, "any person" may bring an action based on unfair methods of competition under § 480. *Kam Ctr.*, 2007 Haw. LEXIS at *25. Under the Hawaii UDAP, a "person" includes "individuals, corporations, . . . limited liability companies, and incorporated and unincorporated associates, existing under or authorized by the laws of this State, or any other state." HAW. REV. STAT. § 480-1. Therefore, while § 480-2 contains language limiting "deceptive acts or practices" claims to consumers, no such language exists for "unfair methods of competition" claims. *Star Mkts., Ltd. v. Texaco, Inc.*, 945 F. Supp. 1344, 1346 (D. Haw. 1996). Because Plaintiffs are three limited liability companies, they are considered "persons" for the purposes of an unfair competition claim. (ECF No. 91 ¶¶ 45-47.) Therefore, because Plaintiffs claim, "Defendants engaged in unfair

methods of competition," they have standing to maintain an unfair competition claim under § 480-2 of the Hawaii UDAP.

### ii.    Michigan

Defendants contend Plaintiffs do not have standing to maintain a cause of action under the Michigan Consumer Protection Act ("MCPA"). (ECF No. 97-1 at 32.) The MCPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," and defines "trade or commerce" as "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes." MICH. COMP. LAWS §§ 445.903(1), 445.902(1)(g). Therefore, "if an item is purchased primarily for business or commercial rather than personal purposes, the MCPA does not supply protection." *Zine v. Chrysler Corp.*, 600 N.W. 2d 384, 393 (Mich. Ct. App. 1999).

Defendants argue Plaintiffs may not maintain a claim under the MCPA because Plaintiffs' Assignors purchased insulin primarily for business or commercial purposes. (ECF No. 97-1 at 33.) Plaintiffs, however, contend their assignors purchased insulin for their enrollees, who used it for a personal or household purpose. (ECF No. 102 at 38.) Insulin is a life-saving medication which is clearly used for personal, family, or household purposes. Accordingly, Plaintiffs may maintain a claim under the MCPA.

### iii.    New York

Defendants contend Plaintiffs do not have standing under the New York General Business Law ("NYGBL") because Plaintiffs' practices are not "consumer oriented." (ECF No. 97-1 at 33.) Plaintiffs, however, contend analyzing the question of standing on this claim is premature at this stage. (ECF No. 102 at 38.)

"[P]arties claiming the benefit of [NYGBL § 349] must, at the threshold, charge conduct that is consumer oriented." *Lake v. Ford Motor Co.*, 2019 U.S. Dist. LEXIS 143956, at *16 (E.D.N.Y. Aug. 22, 2019) (citing *N.Y. Univ. v. Continental Ins. Co.*, N.E.2d 283, 320 (N.Y. 1995)). An injury is not consumer oriented if it involves "business-to-business transactions." *ExxonMobil Inter-America v. Advanced Info. Eng'g Servs.*, 328 F. Supp. 2d 443, 448 (S.D.N.Y. 2004). Specifically, NYGBL § 349 does not give rise to claims arising from transactions "involving complex arrangements, knowledgeable and experienced parties and large sums of money." *Id.*; *see also N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 770 (N.Y. 1995) (finding NYGBL inapplicable in a case involving complex insurance coverage where each side was knowledgeable and received expert representation and advice).

Plaintiffs are three limited liability corporations and defendants are one limited liability corporation and two corporations. (ECF No. 91 ¶¶ 44-51.) Each party is a sophisticated business, and the transactions involved in the dispute are between other sophisticated businesses. Therefore, the transactions are not consumer oriented, *ExxonMobil Inter-America*, 328 F. Supp. 2d at 448, and Plaintiffs may not assert claims under NYGBL. *See United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 474 (S.D.N.Y. 2014) (dismissing a NYGBL claim where conduct concerned business to business transactions are parties were sophisticated). Accordingly, Plaintiffs NYGBL cause of action is dismissed.

#### iv.    Pennsylvania

Defendants contend Plaintiffs may not assert a cause of action under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") because Plaintiffs' Assignors are not consumers. (ECF No. 97-1 at 35.) Plaintiffs, however, argue the insulin was in fact

purchased for their enrollees' personal use. (ECF No. 102 at 40.)

Under the UTPCPL, a plaintiff may bring a private action only if the plaintiff "purchase[d] . . . goods or services primarily for personal, family or household use." 73 PA. CONS. STAT. ANN. § 201-9.2(a). The Third Circuit has held this requirement to restrict private actions to those brought by consumers. *See Balderston v. Medtronic Sofamor Danek, Inc.*, 285 F.3d 238 (3d Cir. 2002). However, courts have held the requirement is satisfied when plaintiffs purchase goods on behalf of consumers who use the goods for personal or household use. *See In re Actiq Sales & Mktg. Practices Litig.*, 790 F. Supp. 2d 313, 327 (E.D. Pa. 2011) (citing *Am. Fed'n of State Cty. and Mun. Empls. v. Ortho-McNeil-Janssen Pharms., Inc.*, 2010 WL 891150, at *3-4 (E.D. Pa. Mar. 11, 2010). Specifically, those courts have distinguished *Balderston* and held TPP plaintiffs had standing to bring UTPCPL claims against drug marketing and distribution defendants. *Id.* at *4. Because Plaintiffs' Assignors purchased insulin on behalf of consumers who used it for personal use, Plaintiffs have standing to sue under the UTPCPL.

### v.    Virginia

Defendants contend Plaintiffs may not assert a claim under the Virginia Consumer Protection Act of 1977 ("VCPA") because the relevant transactions in the claim are not within the scope of the VCPA. (ECF No. 97-1 at 35.)

The VCPA only applies to acts in connection with a "consumer transaction," which includes the sale of goods and services "for personal, family or household purposes." VA. CODE ANN. § 59.1-198. Therefore, sales between merchants—or any sales not directly to a consumer— are not within the scope of the VCPA. *See, e.g.*, *Baker v. Elam*, 883 F. Supp. 2d 576, 579 (E.D. Va. 2012) (finding merchant to merchant transactions to be outside the scope of the VCPA);

*Eubank v. Ford Motor Credit Co.*, 2000 WL 33595057, at *2 (Va. Cir. Ct. 2000) (same).

Plaintiffs' Assignors are not consumers under the VCPA. Additionally, notwithstanding the ultimate personal use of the insulin sold between Defendants and Plaintiffs' assignors, the transaction at issue concerns two merchants. Accordingly, Plaintiffs may not maintain a cause of action under the VCPA.

### vi.    West Virginia

Defendants contend Plaintiffs may not assert a claim under the West Virginia Consumer Credit and Protection Act ("WVCCPA") because Plaintiffs' Assignors are not "natural persons" within the meaning of the WVCCPA. (ECF No. 97-1 at 37.) Plaintiffs do not dispute this.

The WVCCPA creates a private cause of action for "any person who purchase or leases goods or services and thereby suffers an ascertainable loss." W. VA CODE § 46A-6-106(a). Courts have held the statute applies only to natural persons and not business entities. *See Any Occasion, LLC v. Florists' Transworld Delivery, Inc.*, 2010 WL 359441, at *2 (N.D. W. Va. Sept. 13, 2010) (dismissing a WVCCPA claim where plaintiff was a limited liability corporation); *see also Ballard v. Bank of Am., N.A.*, 2013 WL 5963068, at *9 (S.D. W. Va. Nov. 7, 2013) (holding that only consumers may maintain a cause of action under the WVCCPA), *aff'd*, 578 F. App'x 226 (4th Cir. 2014).

Plaintiffs do not dispute they are not "natural persons" within the meaning of the WVCCPA. Because Plaintiffs allege their assignors are various organizations and not natural persons, they may not bring a claim under the WVCCPA.

23

### vii.    Wisconsin

Defendants contend Plaintiffs are unable to maintain a claim under the Wisconsin Deceptive Trade Practices Act ("WDTPA") because Plaintiffs' Assignors are not members of "the public" under the WDTPA. (ECF No. 97-1 at 38.) Plaintiffs contend they have satisfied the elements to maintain a WDTPA claim because they allege there were "untrue, deceptive, or misleading representations to induce a financial transaction." (ECF No. 102 at 41.)

To state a claim under the WDTPA, a plaintiff must allege: (1) a defendant made a representation to the public with intent to induce an obligation; (2) the representation was untrue, deceptive, or misleading; and (3) the representation caused the plaintiff a pecuniary loss. *K&S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 732 N.W.2d 792, 798 (Wis. 2007). In this context, a plaintiff will by a member of "the public" unless a particular relationship exists between him and the defendant. *Id.* While this normally refers to a contractual relationship, a "particular relationship" can exist absent a contract where the plaintiff and defendant had an "ongoing relationship" to purchase goods. *Uniek, Inc. v. Dollar Gen. Corp.*, 474 F. Supp. 2d 1034, 1039 (W.D. Wis. 2007).

Plaintiffs' claims stem from an ongoing contractual relationship between Plaintiffs' Assignors and PBMs. (ECF No. 91 ¶¶ 18, 22, 37.) This, along with Plaintiffs' failure to allege their assignors actually are members of the public, forecloses Plaintiffs' ability to bring a claim under the WDTPA.

24

### 3. Indirect Purchaser Rule

#### i. Arizona

Defendants contend Plaintiffs cannot maintain a claim under the Arizona Consumer Fraud Act ("ACFA") because the claim is barred by the indirect purchaser rule. (ECF No. 97-1.) Plaintiffs, however, argue the ACFA does not expressly require a direct merchant-consumer transaction.

Plaintiffs do not allege they are direct purchasers and readily admit they are multiple purchasers down the chain of commerce. (ECF No. 91 ¶¶ 98-113.) However, they contend the Arizona Supreme Court has held the AFCA "does not expressly require a direct merchant-consumer transaction." *Watts v. Medicis Pharmaceutical Corp.*, 365 P.3d 944, 953 (Ariz. 2016). In *Watts*, a plaintiff received—along with her prescription—documentation from defendant drug manufacturer which included "misrepresentations and omissions of material facts." *Id.* at 947-48. The Arizona Supreme Court found that despite the absence of a direct merchant-consumer transaction, the documentation received directly from the drug manufacturer was closely related enough to state a claim under the AFCA. *Id.* at 953. Here, however, the link between Plaintiffs and Defendants' alleged misrepresentations is too attenuated to comport with the holding of *Watts*. As this Court previously stated, "Plaintiffs never allege they are direct purchasers of insulin from Defendants and readily admit that they are multiple purchasers down the chain of commerce." (ECF No. 89 at 37.) Additionally, Plaintiffs do not allege to have received information directly from Defendants in a manner similar to the documentation that plaintiff in *Watts* received. Therefore, Plaintiffs may not properly assert a cause of action under the AFCA.

### ii.    Alaska

Defendants contend Plaintiffs may not maintain a claim under the Alaska Unfair Trade Practices and Consumer Protection Act ("AUTPCPA") because they lack standing under the indirect purchaser rule. (ECF No. 97-1 at 39.)

As it stands, the Alaskan state courts have not specifically resolved the issue of whether indirect purchaser has standing to bring an action under the AUTPCA. *See In re Dynamic Random-Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072, 1108 (N.D. Cal. 2007); *see also In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1163 (N.D. Cal. 2015). Therefore, this Court declines to resolve a unique question of Alaska state law and will instead read the AUTCPA to deny indirect purchaser standing, as no court has affirmatively found to the contrary. Accordingly, Plaintiffs fail to state a claim and therefore the claim is dismissed.

### 4.    Indiana Common Law Claims

### i.    Fraud

Defendants contend Plaintiffs have not stated a claim for common law fraud under Indiana law because the misrepresentation was not made directly to Plaintiffs' Assignors. (ECF No. 97-1 at 40-41.) Plaintiffs argue they have properly plead a common law fraud claim because Defendants' misrepresentations were public. (ECF No. 102 at 45.)

To state a common law fraud claim in Indiana, a plaintiff must allege: (1) material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) proximately caused the injury or damage complained of. *Kelsing v. Hubler Nissan Inc.*, 997 N.E.2d 327, 335 (Ind. 2013). However, to proceed on a fraud

claim, defendant must have made misrepresentations directly to the plaintiff. *See Lycan v. Walters*, 904 F. Supp. 884, 897 (S.D. Ind. 1995) (dismissing an Indiana fraud claim because "[p]laintiffs cannot premise their fraud claim on statements that were not made to them"). Defendants contend—and Plaintiffs do not dispute—any misrepresentations they may have made were not made directly to Plaintiffs' Assignors. (ECF No. 97-1 at 41.) Accordingly, Plaintiffs may not maintain a common law fraud claim under Indiana law.

### ii.    Unjust Enrichment

Defendants contend Plaintiffs fail to assert an unjust enrichment claim under Indiana law because Plaintiffs do not allege they expected payment. (ECF No. 97-1 at 42.)

To state an unjust enrichment claim under Indiana law, a plaintiff must plead "(1) a benefit conferred upon another at the express or implied request of this other party; (2) allowing the other party to retain the benefit without restitution would be unjust; and (3) the plaintiff expected payment." *Woodruff v. Indiana Family & Soc. Servs. Admin.* 964 N.E.2d 784, 791 (Ind. 2012). Plaintiffs do not allege their assignors expected payment. Failure to plead this element is fatal to an unjust enrichment claim. *See, e.g. Reed v. Reid*, 980 N.E.2d 277, 296 (Ind. 2012) (affirming rejection of an unjust enrichment claim where plaintiff did not allege he expected to be paid by defendants); *Bayh v. Sonnenburg*, 573 N.E.2d 398, 409 (Ind. 1991) ("Plaintiffs' unjust enrichment claim fails because they lacked a subjective expectation of payment."). Accordingly, Plaintiffs fail to plead an unjust enrichment claim under Indiana law.

## III.    CONCLUSION

For the foregoing reasons, Defendants Motion to Dismiss the Second Amended Complaint for lack of Article III standing is **DENIED**; Defendants' Motion to Dismiss Plaintiffs' RICO claims is **GRANTED**; Defendants' Motion to Dismiss Plaintiffs' request for injunctive relief under RICO is **GRANTED**; Defendants' Motion to Dismiss Plaintiffs' state consumer protection law causes of action is **GRANTED** with respect to New York, Virginia, West Virginia, Wisconsin, Arizona, and Alaska law  and **DENIED** with respect to Hawaii, Michigan, and Pennsylvania law; Defendants' Motion to Dismiss Plaintiffs' common law fraud claim is **GRANTED**; and Defendants' Motion to Dismiss Plaintiffs' unjust enrichment claim is **GRANTED**.

**Date: February 20, 2020**                                    */s/ Brian R. Martinotti*
                                                                         **HON. BRIAN R. MARTINOTTI**
                                                                         **UNITED STATES DISTRICT JUDGE**